**NOMIKI NESKES**, as Putative Personal Representative of **EMMANUEL NESKES**, and **NOMIKI NESKES**, Individually,

                          Estate Plaintiff,

      vs.

**AMERICAN CONTRACT SYSTEMS, INC.**, a Foreign Corporation; **O&M HALYARD, INC.**, a Foreign Corporation; **OWENS & MINOR, INC.**, a Foreign Corporation; **CROCI REAL ESTATE, LLC**, a Florida Limited Liability Company; **LEESAR, INC.**, a Florida Corporation; **PHILIP FLEISCHHACKER; ROBERT COOK**; and **PENNY WALLS**.

                    Defendants.

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT, IN AND FOR LEE COUNTY, FLORIDA

CASE NUMBER:
DIVISION:

## COMPLAINT

**COMES NOW** the Plaintiffs, **NOMIKI NESKES**, as Putative Personal Representative of **EMMANUEL NESKES** ("Estate Plaintiff"), and **NOMIKI NESKES**, Individually ("Individual Plaintiff"), by and through undersigned counsel, and hereby files this Complaint against Defendants, **AMERICAN CONTRACT SYSTEMS, INC.**, **O&M HALYARD, INC.**, **OWENS & MINOR, INC.**, **CROCI REAL ESTATE, LLC**, **LEESAR, INC.**, **PHILIP FLEISCHHACKER**, **ROBERT COOK**, and **PENNY WALLS**, and alleges:

## JURISDICTION, VENUE AND PARTIES

1.      This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00), exclusive of interest, attorneys' fees and costs.

2.      Venue for this action lies in Lee County, Florida, because the torts giving rise to the claims asserted herein were committed in Lee County, Florida.

3.      Nomiki Neskes brings this action as the putative personal representative of the Estate of Emmanuel Neskes, pursuant to the Florida Wrongful Death Act, Fla. Stat. §§ 768.16-768.26, as well as for herself individually. The potential beneficiaries of this wrongful death action as alleged below in Counts I-XIV below are: (a) Nomiki Neskes, surviving spouse (referred to in this capacity as "Surviving Spouse"); and (b) the Estate of Emmanuel Neskes (referred to as "the Estate"). At all times material hereto, Nomiki Neskes, Individual Plaintiff, and Emmanuel Neskes ("Estate Plaintiff's Decedent") resided in Fort Myers, Lee County, Florida.  Individual Plaintiff and Estate Plaintiff are each citizens of the State of Florida.

4.      This Court has personal jurisdiction of Defendant, **AMERICAN CONTRACT SYSTEMS, INC.** ("ACS"), pursuant to Section 48.193(b). Fla. Stat., because at all times material hereto ACS was a Minnesota corporation and was authorized to transact business and was actually doing business in the State of Florida, as well as maintaining, at various times material, one or more agents or employees in the State of Florida.

5.      This Court has personal jurisdiction of Defendant, **O&M HALYARD, INC.,** ("O&M Halyard"), pursuant to Section 48.193(b), Fla. Stat., because at all times material hereto O&M Halyard was a Virginia corporation with its principal place of business in the State of Virginia (at the same corporate address as Defendant, **OWENS & MINOR, INC.**), and was authorized to transact business and was actually doing business in the State of Florida, as well as maintaining one or more agents or employees in the State of Florida.

6.      This Court has personal jurisdiction over Defendant, **OWENS & MINOR, INC.** ("OMI"), pursuant to Florida's long-arm statute, including Fla. Stat. § 48.193(1)(a)(1) (operating, conducting, or carrying on business in Florida), and Fla. Stat. § 48.193(1)(a)(2) (committing a tortious act within this state) and Fla. Stat. § 48.193(2). Jurisdiction is proper based on OMI's

direct, systematic contacts with Florida, and alternatively, by imputing the contacts of its agents and alter egos, ACS and O&M Halyard. The factual bases for this jurisdiction, as alleged more fully below, upon information and belief, include: (a) OMI personally and continuously conducts substantial business in Florida by advertising open positions for "OMI employees" (¶ 290) and claiming operation of multiple "OMI" distribution centers in Florida, disregarding any subsidiary corporate form (¶ 291); (b) OMI exercises "high and very significant" control over its Florida-based subsidiary ACS, sufficient to render ACS its agent and alter ego, by completely bypassing the intermediary (O&M Halyard) to exert direct, daily operational command; (c) this direct domination is evidenced by OMI staffing ACS facilities with employees who identify as OMI employees (¶ 281), the ACS General Manager, Charlie Persby, identifying as an OMI VP (¶ 288); and OMI providing all various business services including human resource, information technology, and legal support (¶ 288); (d) OMI further exercises direct command by handling all key regulatory compliance (¶ 280), managing product recalls as "Owens & Minor" (¶ 289), and being identified by the FDA as the actual operator: "Owens & Minor, Inc. dba American Contract Systems, Inc." (¶ 287); (e) OMI holds the entire structure out as a single, "fully integrated" enterprise in all public-facing and investor communications, using "we" and "our" and omitting O&M Halyard from the public narrative ((¶ 272), (¶ 276), (¶ 278), (¶ 292)); (f) O&M Halyard acquiescing to OMI's bypass and functioning merely as a passive stooge intermediary, a legal structure designed by OMI solely to create a fraudulent layer of corporate distance ((¶ 275), (¶ 284)). Accordingly, under established agency and alter ego principles, the Florida business operations and tortious acts committed by ACS in Florida (satisfying § 48.193(1)(a)(1), (1)(a)(2) and (2)) are imputed to OMI. These direct and imputed contacts demonstrate that OMI "purposefully availed" itself of the privileges of conducting business in Florida, establishing

3

sufficient "minimum contacts" such that this Court's exercise of jurisdiction fully comports with federal constitutional Due Process and "traditional notions of fair play and substantial justice".

7.    This Court has personal jurisdiction over Defendant, **CROCI REAL ESTATE, LLC** ("Croci"), because at all times material hereto Croci was a Florida limited liability company organized under Florida law with one or more members who are currently residents and citizens of Florida. Croci is a citizen of the State of Florida.

8.    This Court has personal jurisdiction over Defendant, **LEESAR, INC.** ("LeeSar"), because at all times material hereto LeeSar was a Florida corporation organized under Florida law, and doing business in the state of Florida. LeeSar is a citizen of the State of Florida.

9.    This Court has personal jurisdiction over Defendant, **PHILIP FLEISCHHACKER** ("the VP of Sterilization Technologies" or "Fleischhacker"), a resident of the state of Minnesota, pursuant to Florida Statute, Section 48.193, subsections (1)(a)1, (1)(a)2, and/or (2) because: (a) Fleischhacker purposefully directed and managed ACS's sterilization operations in Fort Myers, even prior to its commencement of operations in 2009 and continuing to the present time. Specifically, he served as the Director of Sterilization overseeing the operation of the Fort Myers sterilization facility, which is the subject of this proceeding. During his tenure from 2009 to the present, upon information and belief, he traveled at times to Florida to personally oversee the facility's operation and regularly submitted regulatory filings to the Florida DEP to secure permits and/or otherwise communicated on behalf of the facility, thereby engaging in a general course of business activity in Florida for pecuniary benefit. See Fla. Stat. §48.193(1)(a); (b) Upon information and belief, when present in the state of Florida, Fleischhacker personally participated in and oversaw the sterilization operations at various ACS EtO sterilization facilities one of which is the subject of this proceeding and which emitted ethylene oxide into the

4

surrounding neighborhoods. As more particularly alleged below, such acts were tortious in nature because they exposed nearby residents to harmful EtO emissions causing substantial injury. See Fla. Stat. §48.193(1)(a)(2) (committing tortious acts in Florida); and (c) as these activities also show, Fleischhacker has for the past 15 years been engaged in substantial and not isolated activity within this state. See Fla. Stat. §48.193(2).

10.     This Court has personal jurisdiction over Defendant, **ROBERT COOK** ("Manager Cook"), because in or about 2010 and continuing until in or about 2018, he was a supervisor and/or acting manager and/or manager, for the EtO Facility, and was and is a resident of Fort Myers, Lee County, Florida as well as a citizen of the State of Florida.

11.     This Court has personal jurisdiction over Defendant, **PENNY WALLS** ("Manager Walls"), because in or about 2018, and continuing until the present time, she was the manager for the EtO Facility, and was and is a resident of Fort Myers, Lee County, Florida as well as a citizen of the State of Florida.

### General Allegations

12.     This case involves the discharge of tons of a noxious gas with a genotoxic, mutagenic, and carcinogenic compound, ethylene oxide ("EtO"), into the air of a heavily populated area of Fort Myers, Lee County, Florida, by a medical sterilization facility located at 11600 Adelmo Lane, Fort Myers, Lee County, Florida 33966 ("the EtO Facility").

13.     Specifically, the area into which these tons of noxious gas were released encompassed residential neighborhoods housing approximately 100,000 to 135,000 people at all times material. This area also included numerous schools and child care centers (92 as of 2023), as well as churches, businesses and stores.

5

14.    From 2010 until December 2021, the EtO Facility was operated by ACS.

15.    After December 2021, the EtO Facility, as more specifically alleged below, either was operated by OMI as part of a fully integrated operation (although nominally in the name of ACS) and/or was operated by ACS as an agent for OMI.

16.    As more specifically alleged below, Estate Plaintiff resided within this area for a substantial amount of time during which unsafe levels of EtO were emitted.

### The Nature and Use of Ethylene Oxide

17.    EtO is a synthetic, colorless, and highly flammable gas at room temperature, used in large volumes as an intermediate in chemical manufacturing and as a sterilant for heat- and moisture-sensitive medical devices.

18.    EtO is sufficiently persistent and mobile in air to allow off-site drift from point sources, contributing to community-level inhalation exposures downwind of the emitting facilities. The atmospheric half-life of EtO is estimated to be between 69 and 149 days.

### Early History of Ethylene Oxide

19.    EtO was first prepared and described in 1859 by Charles-Adolphe Wurtz, marking the earliest scientific recognition of the compound's highly reactive epoxide structure, which would later underpin its biocidal and sterilizing capabilities.

20.    By 1914, EtO entered industrial-scale production via the chlorohydrin process; after 1931, production shifted to direct oxidation with a silver catalyst, reflecting EtO's rapid integration into chemical manufacturing.

21.    In 1928, peer-reviewed research identified EtO as a powerful insecticide/fumigant, documenting broad efficacy, a property later exploited for microbial sterilization of heat-sensitive materials.

6

### *Decades of Warnings: A Chronology of Recognized EtO Hazards*

22.     In 1940, U.S. inventors patented a vacuum-chamber EtO sterilization method for spices and food preservatives, reflecting early industrial awareness of EtO's powerful biocidal action and the need for post-sterilization aeration.

23.     The scientific literature reported mutagenic activity of EtO in *Drosophila* (fruit flies) as early as 1948 in mutagenicity reports, identifying genetic hazards long before modern federal carcinogenicity classifications, a fact later summarized by international health authorities.

24.     As early as 1977, the U.S. National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO increases mutation frequency in humans and recommended stringent controls because of EtO's mutagenic and carcinogenic potential.

25.     In 1981, NIOSH formally recommended that EtO be treated as a potential occupational carcinogen based on emerging evidence of carcinogenicity, mutagenicity, and reproductive toxicity.

26.     In 1984-1985, the Occupational Safety and Health Administration ("OSHA") promulgated the EtO standard, establishing a 1 ppm 8-hour time-weighted average permissible exposure limit because EtO presents carcinogenic, mutagenic, genotoxic, reproductive, neurologic, and sensitization hazards.

27.     In 1990, Congress, in enacting the Clean Air Act Amendments, listed EtO as a Hazardous Air Pollutant, requiring the U.S. Environmental Protection Agency ("EPA") to regulate emissions from industrial sources, including commercial sterilizers.

28.     The International Agency for Research on Cancer ("IARC") has classified EtO in Group 1 ("carcinogenic to humans") since at least 1994, its highest risk category.

29.     In 1994, the EPA promulgated the National Emission Standards for Hazardous Air Pollutants ("NESHAP") which included requirements for commercial sterilization facilities to control EtO emissions.

30.     In 2016, after further peer review and science updates, EPA's Integrated Risk Information System (IRIS) assessment classified EtO as "carcinogenic to humans" and derived an inhalation unit risk for lifetime cancer risk estimation.

31.     In 2018, the National Air Toxics Assessment ("NATA") by the EPA (using 2014 emissions) identified elevated cancer risks near certain sterilizer facilities, informing community risk communications and follow on actions.

32.     In December 2019, the EPA published Advanced Notice of Rulemaking for Ethylene Oxide Sterilization and Fumigation Operations. These proposed regulations were intended to significantly restrict emissions of EtO in light of the widely accepted understanding that EtO causes cancer.

33.     In 2021, the U.S. National Toxicology Program ("NTP") listed EtO as "Known to be a Human Carcinogen," citing sufficient evidence of carcinogenicity from studies in humans including increased risks of lymphoid malignancies and breast cancer.

34.     On April 5, 2024, the EPA finalized amendments to 40 C.F.R. 63, Subpart O, for commercial sterilization facilities, targeting risk reductions consistent with EtO's carcinogenicity and requiring more stringent controls and monitoring.

### *The Biological Mechanisms and Health Consequences of EtO Exposure*

35.     EtO causes cancer and other adverse health effects through multiple pathways of cellular and molecular damage, including but not limited to its properties as a highly reactive chemical that directly attacks and damages critical biological molecules within human cells, such

8

as DNA, proteins, and cellular structures. These chemical interactions and biological responses disrupt normal cellular processes, overwhelm the body's natural defense and repair mechanisms, and trigger pathological changes that lead to cancer development and other serious health consequences. By way of example and without limitation, EtO's documented mechanisms of biological damage include some of the following described processes.

36.      EtO can initiate cancer by directly attacking and breaking the DNA within human cells. DNA is structured as a double helix, like a twisted ladder, where two long strands are held together by rungs made of paired chemical bases. The forces that hold these base pairs together are hydrogen bonds. There are four types of these bases: Adenine (A), Thymine (T), Cytosine (C), and Guanine (G). This chemical assault occurs in two primary ways. First, EtO chemically bonds to the DNA, primarily attacking the guanine base to form damaging lesions called DNA adducts. These adducts corrupt the genetic code, creating permanent gene mutations, akin to a critical typo in a cell's blueprint, that can disable the genes responsible for controlling cell growth.[1] Second, beyond these specific "typo" mutations, EtO exposure also causes large-scale structural damage to the chromosomes. This is observed in exposed populations as chromosomal aberrations (breaks and rearrangements of the chromosome structure) and sister chromatid exchanges (abnormal swaps of genetic material), both of which indicate profound genetic instability. This combined assault on the integrity of the genetic code, from individual gene

---

[1] This specific mutagenic carcinogenesis relies upon EtO's direct alkylation of DNA bases, particularly forming N7-(2-hydroxyethyl) guanine adducts. These guanine adducts are highly genotoxic because: (a) Depurination - the N7-hydroxyethylguanine adduct destabilizes the glycosidic bond, leading to spontaneous loss of the guanine base and creating apurinic (AP) sites in DNA; (b) Mutagenic lesions - AP sites are highly mutagenic as DNA polymerase often inserts adenine opposite these sites (following the "A-rule"), leading to G→T transversion mutations, and can cause replication fork stalling and chromosomal breaks; (c) Ring-opening - some N7-alkylguanine adducts undergo ring-opening to form more stable but highly mutagenic lesions; and (d) Repair complications - while base excision repair can handle some lesions, ethylene oxide's high reactivity can overwhelm repair capacity, allowing adducts to persist through replication.

9

mutations to catastrophic chromosomal damages, is the well-established mutagenic mode of action by which EtO exposure leads to the development of cancer.

37.     This mode of action is particularly damaging in children who are chronically exposed to EtO due to their ongoing physiological development. Because a child's body is in a constant state of growth, their cells divide much more rapidly than an adult's. This accelerated rate of cell proliferation means there are more opportunities for the mutations induced by EtO to be replicated and become permanent, potentially leading to an increased risk of certain cancers later in life. Furthermore, children's bodies are less equipped to repair the genetic damage caused by chemical exposures compared to adults. Their metabolic and detoxification pathways are not yet fully mature, making them less efficient at breaking down and eliminating harmful substances like EtO. This combination of rapid cell growth and diminished repair capacity renders children uniquely susceptible to the damaging effects of this mutagenic compound.

38.     Genotoxicity findings in exposed populations have included DNA adduct formation, chromosomal aberrations, and sister chromatid exchanges, consistent with this mutagenic mode of action. Hospital-based occupational studies have documented these chromosomal aberrations and other genotoxic endpoints in EtO-exposed medical personnel, further corroborating mutagenicity in humans.

39.     EtO exposure has been epidemiologically related to lympho-hematopoietic cancers and breast cancers.

40.     In addition to cancer, EtO exposure can also result in other adverse health consequences. Respiratory irritation, neurologic effects, sensitization, and reproductive/developmental endpoints have all been established as consequences of EtO exposure, prompting OSHA to promulgate protective standards and provide ongoing public-health guidance.

10

### *Medical Sterilization and EtO*

41.    By the time commercial sterilization facilities expanded near residential areas in the 1990s-2010s, federal and international authorities had already publicly recognized EtO's mutagenicity (1977), carcinogenic potential (1981), carcinogenic risk warranting regulation (1984-1994), and had definitively classified it as carcinogenic to humans (1994), making long-standing knowledge of EtO's danger indisputable.

42.    Community exposure pathways include stack emissions, fugitive releases, and off-gassing from sterilized products during aeration, storage, or transport.

43.    At all times material, OSHA has required prominent warning signs for regulated areas and labels stating "DANGER--ETHYLENE OXIDE. CANCER AND REPRODUCTIVE HAZARD," underscoring governmental recognition that EtO poses serious carcinogenic and reproductive risks that must be communicated.

44.    OSHA's Hazard Communication Standard requires employers to warn downstream workers about the hazards of chemicals that are released from products they handle. This duty underscores federal recognition that EtO hazards can extend beyond the initial sterilization site. OSHA has long clarified that the Hazard Communication Standard "article" exemption, that would relieve an employer of this duty to warn downstream workers, applies only where a product does not release a hazardous chemical in a manner posing health risks under normal conditions of use; where releases occur, labeling and downstream warnings are required.

45.    OSHA's standard exempts finished "articles" from this warning requirement, but only if they do not release hazardous chemicals in a way that poses a health risk to employees. Because EtO-sterilized devices may continue to "off-gas" residual EtO during transport and handling, they are not exempt "articles," and their bulk shipping containers require labeling to warn downstream workers.

11

46. The sterilization industry itself acknowledges and manages this mobile hazard through detailed safety standards. The U.S. Food & Drug Administration ("FDA") recognizes the international standard ISO 10993-7, which establishes the maximum allowable limits for EtO residuals on sterilized devices. The existence of this standard is the industry's own admission that EtO off-gassing is a known, measurable, and persistent hazard that must be controlled.

47. Consistent with decades of research, multiple public-health investigations have confirmed that communities located near industrial sterilization facilities using EtO do, in fact, experience elevated rates of cancer, including lympho-hematopoietic cancers, breast cancer, and other malignancies affecting both adults and children.

48. Air-quality around EtO-utilizing sterilization facilities reflect ambient concentrations of EtO that correspond to excess cancer risks that are orders of magnitude above levels considered acceptable by federal regulators, including risks approaching one additional case in one-hundred exposed individuals. This amounts to a risk 10,000 times higher than the target one in a million-risk assessment target of the EPA and 100 times higher than the EPA's most liberal risk assessment target.

49. Actual concentrations of EtO around operating facilities have significantly exceeded federal estimates, demonstrating that EPA modeled data understates the true cancer risks to surrounding neighborhoods.

### The EtO Facility: ACS and LeeSar Working Hand in Hand

50. LeeSar is a Fort Myers-based healthcare supply chain and medical distribution company whose business includes assembling custom-packed surgical trays ("Custom Packs" or "CPTs"). Defendant ACS is a sterilization services company. On its public website, LeeSar identifies ACS as its partner, stating: "In partnership with American Contract Systems, our Pack

12

Operations department sterilizes and packages... surgical procedures." Upon information and belief, this partnership is a deeply integrated, co-located operation at the EtO Facility, where LeeSar and ACS work hand in hand to assemble and sterilize medical devices.

51.    Upon information and belief, LeeSar operates as a regional distribution and supply company with multiple service lines, including the assembly and distribution of Custom Packs. LeeSar is not a passive purchaser; it specifies product lines, build standards, and delivery cadence for these Custom Packs.

52.    Upon information and belief, LeeSar dictates how Custom Packs are configured (bill of materials, component layout, and packaging), how many are built in a given interval, and when lots are released, thereby setting the throughput that ACS is required to fulfill. Orders run under LeeSar's specifications and account structure; ACS's role is to sterilize those LeeSar-directed builds rather than to generate sterilization volume independently.

53.    By fixing the number of Custom Packs to be built, their component mix, and the release cadence, LeeSar determines the volume and density of injected bags entering each ACS cycle and, with it, the mass of EtO introduced and desorbed per run (i.e., LeeSar sets the sterilization workload that drives ACS's emissions-creating operations).

54.    Upon information and belief, LeeSar personnel assemble the Custom Packs in a common assembly room, stage the completed (non-sterile) packs in outer packaging for transfer, and release those staged lots to ACS for sterilization processing under LeeSar's schedule. This operational handoff, assembly/staging by LeeSar followed by sterilization by ACS, reflects an integrated, co-located workflow in practice, with LeeSar's specifications and quantities controlling ACS's downstream cycles.

13

55.    ACS has not operated a traditional pallet-chamber sterilizer at the EtO Facility. Instead, ACS used the "bag method," whereby individual polyethylene bags were injected with EtO rather than flooding a large chamber. ACS has acknowledged this distinction, describing its process as "filling plastic bags with ethylene oxide, not large chambers."

56.    According to various regulatory filings and public disclosures, the EtO Facility, operating as a single-item sterilizer utilizing the gas-in-bag method, claimed to follow the following workflow: (a) the EtO injection occurred in a designated injection area using permeable polyethylene ("PE") bags of varying sizes, including a small bag (18 in. L × 25 in. W), a medium bag (22.5 in. L × 26 in. W), and a large bag (25 in. L × 33.5 in. W). The bag walls were fabricated to permit rapid gas diffusion. The target EtO fill was approximately 3.1 to 8.1 grams per bag, depending on size; (b) immediately upon injection, before placement in any chamber, the bags began off-gassing EtO through the PE bag. Operators then sealed the bags, placed them into corrugated boxes, and loaded the boxed units onto pallets. During boxing and palletizing, off-gassing continued from every injected bag, creating ongoing fugitive emissions in the injection/packing area and along intra-facility transit routes; (c) palletized, injected bags were then transferred into one of six identical combined single chambers (providing for sterilization and aeration). The chamber operated at approximately 108°F for a minimum of 64 hours, with ventilation at roughly 20 air changes per hour ("ACH") to remove desorbing EtO. Because the same enclosure served both the sterilization and aeration phases, desorption (off-gassing) of EtO from the bags continued throughout the single-chamber cycle. Upon information and belief, until the installation of scrubbers in July 2023, the vents from these chambers emitted essentially all of the EtO utilized at the EtO Facility; and (d) upon cycle completion, pallets were removed to a quarantine area for biological testing before being sent to distribution.

14

57. The EtO Facility reports that generally at least one single-chamber is in use at any given time, releasing EtO at regular intervals into the community.

58. Utilizing its actual workflow, which may have diverged from its reported workflow, the EtO Facility's emissions began at the moment of EtO injection (pre-chamber), persisted during boxing and palletizing, and increased during the combined sterilization/aeration cycle, establishing a continuous emissions pathway.

59. Even with the emission controls installed in 2023, the surrounding area is still subject to hazardous concentrations of EtO at ground level. The scrubbers only treat the air that is captured and vented from the chambers through the exhaust stack. The scrubbers are unable to capture fugitive emissions that are released during the process, as EtO off-gasses from the permeable bags during the initial gas injection, the subsequent boxing and palletizing, and the transit of the pallets to the chambers.

60. Furthermore, human error and operational issues can lead to additional fugitive releases. For example, the improper sealing of a bag, a tear in a pouch, or a maintenance failure in the injection equipment could release concentrated EtO directly into the EtO Facility's workspace, which is then vented into the surrounding air as an unmonitored and uncontrolled fugitive emission. This ensures that even with emission controls on the main stack, the process itself continues to release hazardous levels of EtO into the community.

### The EtO Facility Emits a Drifting Low Level Plume

61. When the EtO escaped the facility as both stack and fugitive emission, it creates ground-level plume in the community.

62. Because EtO is a persistent gas with a long atmospheric half-life, this concentrated, ground-level plume did not dissipate easily, as it was constantly being fed by the near constant

15

stream of emissions, leading to persistent, chronic exposure for those in the surrounding neighborhoods.

### *Estate Plaintiff's Exposure to Ethylene Oxide*

63.    Individual Plaintiff was born in 1958. Estate Plaintiff's Decedent was born in 1946. Estate Plaintiff's Decedent died on September 26, 2023.

64.    In or about 2011, which was about a year after the EtO Facility commenced operating in 2010, Estate Plaintiff's Decedent and Individual Plaintiff began residing full-time at 6838 Highland Pines Circle, Fort Myers FL 33966, which is approximately 1.23 miles from the EtO Facility. Estate Plaintiff's Decedent continued to reside there through the date of the decedent's death. Individual Plaintiff has continued to reside there through the date of the filing of this action. The location where the two lived as above alleged, is located within the area where the plume of EtO, emitted from the EtO Facility, would drift and linger. This location is referred to hereinafter simply as the "Exposure Zone".

65.    Estate Plaintiff's Decedent and Individual Plaintiff, chronically inhaled EtO emitted from the EtO Facility while residing in the Exposure Zone from 2011 through the present (or through the date of death for the decedent, as applicable). This period of time is referred to hereinafter as the "Period of Exposure."

66.    Estate Plaintiff's decedent death was caused by Non-Hodgkins-Lymphoma. On March 1, 2025, Individual Plaintiff was diagnosed with breast cancer. This was the first date that Individual Plaintiff learned of the cancer. The type of cancer with which Estate Plaintiff's Decedent and Individual Plaintiff suffered are the type of cancers that are caused by chronic EtO exposure, as alleged above.

67.     During the entire Period of Exposure, the amount of EtO in the Exposure Zone far exceeded safe, reasonable and acceptable levels.

68.     The concentrations of the uncontrolled EtO emissions from the EtO Facility were far greater than the levels the EPA recognizes as posing an unacceptable cancer risk or otherwise safe levels.  Even now, after the installation of emission-control scrubbers, the facility continues to release EtO at hazardous levels.

69.     These EtO emissions routinely migrated from the EtO Facility to the Exposure Zone.  This resulted in both Estate Plaintiff Decedent's and Individual Plaintiff's long-term, involuntary inhalation of EtO into their lungs, resulting in it entering their blood stream and being carried throughout their bodies. The chronic cellular exposure to EtO resulted in damage to their DNA. In turn, as more particularly described above, the damaged DNA replicated within their bodies, substantially causing their respective cancers.

### _SECTION A:_
### _CLAIMS OF THE ESTATE PLAINTIFF_

#### PART 1
#### ESTATE PLAINTIFF STRICT LIABILITY CLAIMS

#### COUNT I
#### (Claim Against ACS for Strict Liability for Ultrahazardous Activity)

70.     Estate Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

71.     Florida adheres to the Restatement (Second) of Torts §§ 519–520, imposing strict liability for activities classified as "abnormally dangerous," which Florida courts describe as "ultrahazardous activities." Bunyak v. Clyde J. Yancey & Sons Dairy, Inc., 438 So.2d 891 (Fla. 2d DCA 1983); Old Island Fumigation, Inc. v. Barbee, 604 So.2d 1246 (Fla. 3d DCA 1992).

17

72.     Section 519(1) provides: "One who carries on an abnormally dangerous activity is subject to liability for harm … resulting from the activity, although he has exercised the utmost care to prevent the harm."

73.     Section 520 enumerates six factors for courts to weigh in determining whether an activity is ultrahazardous: (a) high degree of risk; (b) likelihood of great harm; (c) inability to eliminate risk by reasonable care; (d) uncommon usage; (e) inappropriateness of the activity to the place; and (f) whether the activity's value to the community is outweighed by its dangerous attributes.

74.     Noxious gases and toxic releases into populated areas are paradigmatically ultrahazardous activities. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 78, at 549–50 (5th ed. 1984) ("noxious gases in the midst of a town").

75.     An application of Restatement factors to the underlying case demonstrates that the carrying on of medical sterilization utilizing EtO is an ultrahazardous activity for which strict liability should be imposed.

76.     The activity, as alleged herein, creates a high degree of risk of great harm that cannot be eliminated by reasonable care, is not a matter of common usage, and is dangerously inappropriate for the populated community where it was conducted.

77.     Medical sterilization using EtO involves a high degree of risk of harm. The process requires introducing EtO, a volatile, mutagenic, and carcinogenic gas, into permeable polyethylene bags. By its nature, EtO disperses at community exposure levels. The process creates a persistent carcinogenic plume over surrounding neighborhoods, placing thousands of nearby residents at constant risk of inhalation exposure. This is the type of "special danger to others" contemplated by Restatement § 520(a).

18

78.     There is a likelihood of great harm inherent in medical sterilization using EtO. The harm EtO causes is not limited to irritation or temporary illness but includes irreversible DNA alkylation, chromosomal aberrations, and cancer. As Florida courts recognized in <u>Old Island Fumigation</u>, an activity that "necessarily involves a risk of serious harm" suffices to trigger strict liability even if only some exposed individuals sustain injury. The seriousness of potential harm here, life-altering or fatal malignancies, places EtO sterilization squarely within this category.

79.     Given current technology, medical sterilizers are unable, through the use of reasonable care, to prevent a level of emissions that create dangerous concentration of EtO in the neighboring community. Even with the belated installation of scrubbers in 2023, the EtO concentrations will remain hazardous from the remaining stack and fugitive emissions which inure to the process. That fact demonstrates that, by definition, the danger cannot be eliminated through due care. This echoes the reasoning in <u>Old Island Fumigation</u>, where despite precautions, fumigant gas escaped through hidden defects, proving the risk could not be eliminated. EtO sterilization is comparable: despite controls, fugitive and stack emissions persist, leaving residents involuntarily exposed.

80.     Medical sterilization is a highly specialized activity which is not a matter of common usage. Florida courts, by adopting the Restatement factors, recognize the importance of this element. <u>See</u> <u>Hutchinson v. Capeletti Bros.</u>, 397 So.2d 952 (Fla. 4th DCA 1981). The official commentary defines "common usage" as an activity "customarily carried on by the great mass of mankind... such as driving automobiles." By contrast, activities conducted by only a "small number of operators" or "comparatively small number of persons," such as blasting or handling explosives, are not common usage. EtO sterilization is a narrow, specialized practice not performed by the public, hospitals, or ordinary businesses. It is confined to fewer than one hundred specialized

19

facilities nationwide. This rare, specialized use is akin to fumigation and blasting, placing it squarely outside of common usage.

81.    EtO sterilization is particularly ill-suited to a facility situated in the heart of a residential community. The surrounding area contained schools, churches, playgrounds, and homes. Location matters. An activity may be acceptable in an isolated industrial zone but ultrahazardous when carried out amidst neighborhoods. Here, the emission of a known carcinogen into a densely populated area epitomizes inappropriateness of location.

82.    The Restatement commentary makes clear that the factor of balancing value to the community against danger concerns local utility of the activity as conducted in that place, not the abstract societal value of the industry. See Restatement (Second) § 520, cmt. k. While sterile medical devices are important to healthcare generally, the EtO Facility's operation provided no unique local benefit. The surrounding community has not and does not depend economically on the EtO Facility, nor do residents receive any offsetting advantage. Instead, the risk of cancer and genetic harm fall entirely on them. Where community value is diffuse and generalized, but danger is concentrated and unavoidable, strict liability is warranted. Even useful but dangerous activities must "pay their own way." Strict liability serves this exact purpose. It ensures that the inevitable costs of an ultrahazardous activity are not forcibly shifted onto the "unlucky few" members of the community who happen to live nearby, but are instead properly borne by the enterprise conducting the activity which is better placed to allocate the burden across society.

83.    All six § 520 factors weigh decisively in favor of classifying EtO sterilization as an ultrahazardous activity under Florida law.

84.     Estate Plaintiff's Decedent was exposed to EtO emissions, sustained DNA injury, and developed cancer and related health effects as a direct and proximate result of Defendants' ultrahazardous activity.

85.     Accordingly, Defendants are strictly liable to Estate Plaintiff for all damages proximately caused by their operation of the EtO Facility, regardless of any care exercised.

86.     As more fully alleged above, the chronic exposure to EtO from the EtO Facility was a substantial cause of Estate Plaintiff's Decedent's cancer and death.

87.     As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

21

## COUNT II
### (Claim Against LeeSar for Vicarious Liability
### Pursuant to Restatement of the Law, Torts, Section 427A)

88.     Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 75 through 83 and incorporates them herein as if fully set forth.

89.     At all relevant times, Defendant LeeSar engaged Defendant ACS to perform EtO sterilization on LeeSar-owned equipment and LeeSar-specified Custom Packs at the EtO Facility.

90.     The EtO sterilization conducted for LeeSar's benefit at this location constitutes an abnormally dangerous and ultrahazardous activity.

91.     The Restatement (Second) of Torts § 427A provides: "One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity."

92.     By engaging ACS to perform the ultrahazardous activity of utilizing EtO to sterilize Custom Packs, LeeSar remains liable for harm caused to any third parties as a result of that activity.

93.     The damages suffered by Estate Plaintiff were proximately caused by the ultrahazardous activity carried out for LeeSar's benefit. Accordingly, LeeSar is strictly liable to Estate Plaintiff for all resulting damages, regardless of fault.

94.     As more fully alleged above, the chronic exposure to EtO from the Eto Facility was a substantial cause of Estate Plaintiff's Decedent's cancer and death. As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the

22

future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **LEESAR, INC.,** for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

**PART 2**
**NUISANCE AND TRESPASS CLAIMS**

**COUNT III**
**(Claim Against ACS for Private Nuisance)**

95.     Estate Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

96.     At all relevant times, Estate Plaintiff resided in the Exposure Zone at such distance from the EtO Facility as alleged above. Estate Plaintiff, as a resident, held a possessory interest in this property.

97.     ACS, through its sterilization operations, has emitted large quantities of EtO, a toxic and carcinogenic gas, into the surrounding community, as more specifically alleged above.

98.     ACS's conduct was intentional, as it knew its operations released EtO, was aware of the gas's toxic and carcinogenic properties, as more specifically alleged above, and knew with

substantial certainty that these emissions would invade the property of nearby residents, including Estate Plaintiff.

99.    EtO emitted from Defendants' facility, including both stack emissions and fugitive emissions, traveled beyond Defendants' property boundaries and invaded Estate Plaintiff's residence and neighborhood environment, including the Exposure Zone, contaminating the air in and around Estate Plaintiff's home(s), yard(s), and immediate neighborhood.

100.    The intrusion of EtO constituted a continuous, involuntary, and unavoidable exposure that materially and substantially interfered with Estate Plaintiff's private use and enjoyment of Estate Plaintiff's property.

101.    The interference was substantial and resulted in actual, material, physical discomfort, causing Estate Plaintiff: (a) physical discomfort, distress, and disruption of daily life; (b) loss of peace of mind and fear of long-term harm; and (c) exposure to serious and permanent health risks, including cancer.

102.    The interference was unreasonable, as: (a) the EtO Facility is situated in or near residential neighborhoods, schools, and businesses, as more specifically alleged above; (b) families and children, including Estate Plaintiff, should not be subjected to carcinogenic gas intruding upon their homes; (c) the harm caused to Estate Plaintiff far outweighed any benefit to the local community; and (d) safer alternatives and emission controls were available to ACS, as more alleged below.

103.    This substantial and unreasonable interference with Estate Plaintiff's use and enjoyment of their property proximately and substantially caused Estate Plaintiff's chronic exposure to EtO at Estate Plaintiff's residence, which created serious risks of bodily injury and disease.

24

104.    Florida law recognizes nuisance claims even where the defendant's operations are otherwise lawful, provided they unreasonably interfere with neighbors' use and enjoyment of property.

105.    As a proximate and substantial result of ACS's private nuisance, Estate Plaintiff suffered chronic exposure to EtO from the EtO Facility, which was a substantial cause of Estate Plaintiff's Decedent's cancer and death.  As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

106.    These injuries, including Estate Plaintiff's diagnosed cancer, were proximately and substantially caused by the chronic exposure to EtO at Estate Plaintiff's residence, resulting in damages including: bodily injury; resulting pain;  suffering; disability; disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care,

25

treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Estate Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Estate Plaintiff's life.

107.    The harm was avoidable, as safer alternatives and effective emission controls, such as dry-bed scrubbers and catalytic oxidizers, were commercially available and customary in the industry, yet ACS failed to install or properly utilize this technology for over a decade.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

### COUNT IV
### (Claim against ACS for Public Nuisance)

108.    Estate Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

109.    As more particularly alleged above, the sterilization process employed by ACS relies on EtO, a noxious, mutagenic, and carcinogenic gas. As more particularly alleged above, this method produced over the years large-scale hazardous emissions that migrated into and about the surrounding community.

110.    In fact, the EtO Facility emitted far more EtO into the nearby community than a similarly situated sterilizer would have had it utilized a traditional method involving far more EtO

(but which EtO was scrubbed consistent with regulatory emission controls and/or abated by applicable regulations with regard to installation of emission controls).

111.    As alleged more particularly above, the EtO Facility's emissions, including stack and fugitive emissions, at all times material, even after installation of emission control devices in 2023, created a chronic plume of EtO that migrated to and over the populated communities near the EtO Facility, landing on residences, cars, clothing, and furniture, thereby constituting an invasion of possessory rights. (The Exposure Zone was within such area.)

112.    The EtO Facility's release of EtO directly into the community was at all times material knowing and intentional.

113.    Given the growing scientific and regulatory awareness of EtO's dangers, as more specifically alleged above, ACS, as a medical sterilizer whose business necessitated the use of EtO, knew the hazards of the quantities it was emitting.

114.    By discharging EtO into the community, ACS unreasonably interfered with rights held in common by the public, including the right to breathe clean air, to be free from involuntary exposure to noxious gas, and to live and recreate in a safe and healthy environment.

115.    The interference caused by ACS's conduct was substantial, continuous, and indiscriminate, impacting a broad cross-section of the public such as residents, schoolchildren, local workers, and community visitors.

116.    ACS created and maintained conditions that endangered the health, comfort, and safety of the public and endangered the public health and safety of the neighborhood at large by releasing noxious carcinogenic emissions into areas where families live, children attend school, and the community carries on daily life.

117.    ACS's emissions of EtO into the Fort Myers community constitute a condition injurious to health, safety, and comfort of the general public.

118.    ACS's emissions additionally constitute a statutory nuisance under Florida law. Florida Statute §386.041 defines the release of gases that are "injurious to... human life" as a public nuisance injurious to health. The release of EtO, a known human carcinogen and genotoxic gas, as alleged above, falls squarely within this statutory definition and constitutes prima facie evidence of a public nuisance

119.    By emitting EtO for more than a decade without emission controls, ACS created an ongoing public health hazard, unreasonably endangering the community, which continues to this day notwithstanding the installation of emission control devices.

120.    Florida recognizes public nuisance claims where emissions affect the health of the broader community.

121.    The interference with public rights caused by ACS's conduct is not speculative or trivial, rather it is real, material, and substantial and has persisted for more than a decade.

122.    ACS's emissions have generated widespread disruption and fear, including: (a) residents altering daily routines to avoid outdoor exposures; (2) residents losing peace of mind due to elevated cancer risks; and (3) residents' impairment of the use and enjoyment of their homes and nearby public spaces.

123.    ACS's conduct is unreasonable because: (a) the EtO Facility is located within or adjacent to a well populated residential areas, schools, day care centers, businesses, homes, and places of worship, as more specifically alleged above, and this siting made the nuisance not hypothetical but inevitable; (b) the harms imposed on the public, including increased cancer risks and genetic damage, are grave and irreversible, as more specifically alleged above;   (c) the

28

community derives no unique or localized benefit from ACS's operations, while bearing the concentrated risks of its emissions.

124.    Estate Plaintiff, in addition to these community-wide harms, has suffered special injuries distinct from the public at large. Specifically, as a proximate and direct result of ACS's public nuisance, Estate Plaintiff's Decedent suffered chronic exposure to EtO from the EtO Facility, which was a substantial cause of Estate Plaintiff's Decedent's cancer and death.  As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

125.    Because Estate Plaintiff's damages are distinct and personal, Estate Plaintiff has standing to assert a public nuisance claim.

126.    ACS's continued operation of the EtO Facility constitutes a wrong to the community as a whole, threatening the health and safety of countless individuals and degrading the livability of the surrounding area.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for damages in a sum within the jurisdictional limits of this Court, together with costs of

29

suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

## COUNT V
### (Claim Against ACS for Trespass)

127.     Estate Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

128.     At all relevant times, Estate Plaintiff owned or was in lawful possession of the real property as alleged more fully above ("Property"), as more specifically alleged above.

129.     ACS knowingly and intentionally emitted hazardous levels of EtO into the surrounding community and onto Estate Plaintiff's Property.

130.     In light of the extensive, decades-long history of scientific and regulatory warnings about EtO's hazards, as alleged above, ACS, a medical sterilizer whose business relied on EtO, knew the dangers of the quantities it was emitting into the neighboring community.

131.     As more particularly alleged above, ACS was aware of the carcinogenic dangers associated with EtO for decades and knew with substantial certainty that its emissions were reaching the surrounding community at dangerous levels and would physically enter Estate Plaintiff's Property.

132.     Notwithstanding this knowledge, ACS intentionally set in motion the events that caused EtO to enter and trespass upon Estate Plaintiff's Property by designing and operating its facility in a manner that it knew would, with substantial certainty, cause stack emissions and fugitive emissions to be released from the building and invade Estate Plaintiff's Property.

30

133.    The siting of the EtO Facility near a densely populated residential area, as more specifically alleged above, made the physical invasion of Estate Plaintiff's Property by these hazardous emissions not merely foreseeable, but inevitable.

134.    EtO is a tangible, physical substance. As a proximate result of ACS's intentional acts, EtO gas and/or particulates physically invaded Estate Plaintiff's Property, landing on and contaminating the soil, the structure of the home, furniture, and other surfaces, and permeating the air within the Property's boundaries.

135.    Further, because of EtO's molecular weight, it can collect, or accumulate, around ground level. When there are calm meteorological conditions, temperature inversions can occur, allowing EtO emitted from the EtO Emitting Facility to become trapped and "hover" near the ground, causing a more concentrated physical invasion of Estate Plaintiff's Property.

136.    ACS was not authorized to cause EtO to enter and remain on Estate Plaintiff's Property.

137.    ACS did not possess any actual or implied permission from Estate Plaintiff to cause EtO to enter Estate Plaintiff's Property.

138.    While ACS may have possessed permits to produce EtO, it did not possess any permit, privilege, or authorization to emit unsafe levels of EtO, to emit unreported fugitive emissions, or to otherwise cause EtO to invade and contaminate Estate Plaintiff's Property in a dangerous, unlawful, and/or harmful manner.

139.    As a proximate and substantial result of ACS's trespass, Estate Plaintiff's Decedent suffered chronic exposure to EtO from the EtO Facility, which was a substantial cause of Estate Plaintiff's Decedent's cancer and death.  As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental

31

pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests this Court enter judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT VI
**(Claim Against LeeSar for Vicarious Liability Pursuant to Restatement of the Law, Torts, Section 427B)**

140.    Estate Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

141.    At all relevant times, LeeSar engaged ACS as an independent contractor to sterilize Custom Packs and other medical devices on LeeSar's behalf.

142.    As more particularly alleged above, the sterilization process employed by ACS relied on EtO, a noxious, mutagenic, and carcinogenic gas. As more particularly alleged above, this method produced over the years large-scale hazardous emissions into the surrounding community. In fact, it emitted far more EtO into the nearby community than a similarly situated

32

sterilizer would have had it utilized a traditional method involving far more EtO, but which EtO was scrubbed consistent with regulatory emission controls.

143.    Restatement (Second) of Torts § 427B provides: "One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance."

144.    In light of the extensive, decades-long history of scientific and regulatory warnings about EtO's hazards, LeeSar, as a medical distributor with a custom packed tray line of business necessitating the use of EtO, combined with the gas-in-bag method utilized by ACS (which, as alleged above, until quite recently emitted virtually all of the EtO utilized in the process into the local community, and which still spews sufficient stack and fugitive emissions to create a chronic elevated and hazardous levels of EtO as more particularly described above), it was clear at all times material, including the outset of the engagement, that hiring and retaining ACS to carry out EtO sterilization in the densely populated community surrounding the EtO Facility (including the Exposure Zone) would likely result in the commission of both a public and private nuisance and trespass to local residents, including Estate Plaintiff.

145.    As alleged more particularly above, ACS's emissions, including stack and fugitive emissions, at all times material, created a chronic plume of EtO that migrated onto Estate Plaintiff's Property, landing on the homes, cars, clothing, furniture, constituting an invasion of possessory rights for which ACS is liable in trespass to Estate Plaintiff as alleged herein above.

146.    The continuous exposure of Estate Plaintiff to the noxious gas constituted, as to Estate Plaintiff, an unreasonable interference with the use and enjoyment of land (a private nuisance) and endangered the public health and safety of the neighborhood at large (a public

nuisance) for which ACS is liable in nuisance to Estate Plaintiff as alleged herein above. The siting of the facility amidst schools, homes, and places of worship made the nuisance and trespass not hypothetical but inevitable.

147. Pursuant to § 427B, LeeSar's liability does not depend on whether it directly operated the sterilizers or dictated ACS's technical emissions practices. The critical fact is that LeeSar hired ACS to engage in work it knew, or should have known, would predictably result in the creation of a nuisance and/or trespass.

148. Estate Plaintiff's Decedent's injuries from chronic EtO inhalation resulting from both nuisance and trespass, as alleged above, was a substantial cause of Estate Plaintiff's cancer and death. As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

149. Accordingly, LeeSar is strictly liable for all damages proximately and substantially resulting from the nuisance and trespass created by ACS's sterilization activities, regardless of fault or delegation, including those damages flowing from Estate Plaintiff's Decedent's death, including: (a) Surviving Spouse's loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate

34

Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate's damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **LEESAR, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

**PART 3**
**NEGLIGENCE AND NEGLIGENCE RELATED CLAIMS**

**Allegations Common to Negligence and Negligence Related Claims**

150.    At all times relevant, ACS, as the owner of the EtO Facility, and the individuals operating the EtO Facility, owed a heightened duty of care to the surrounding community, including Estate Plaintiff, when using and emitting EtO. Because EtO is an ultra-hazardous substance, those who handle it have a heightened duty to protect the public from the unreasonable and unparalleled risk of injury it poses. This duty extends to an expansive foreseeable zone of risk, requiring the owner of the EtO Facility as well as the individuals operating the EtO Facility to conform to a standard of conduct that prevents foreseeable harm to the surrounding community, including Estate Plaintiff. As the entity creating the risk, the owner of the EtO Facility and those

35

individuals operating the EtO Facility are in a superior position to recognize and address the dangers of its process and must therefore act diligently to avoid unreasonable risks to those exposed. Ultimately, this heightened duty requires proactive risk management and strict adherence to all safety measures to protect the health and well-being of the community.

151.    At all relevant times, the EtO Facility was subject to the NESHAP regulation, 40 CFR Part 63, Subpart O, which mandated that any facility using one ton (2,000 lbs.) or more of EtO annually must reduce emissions by 99%.

152.    Despite this mandate, ACS (led by Fleischhacker) represented in its 2009 permit application that its "6 Aeration Chambers" had "None required" for control technology.

153.    The EtO Facility's internal logs show its EtO usage surpassed the 1-ton trigger in 2013, reaching 2,358 pounds. Upon information and belief, this was neither the first time nor the last time that the EtO Facility, in fact, exceeded their 1-ton permit limit.

154.    This excess use triggered the 99% mandate. ACS (led by Fleischhacker), admitted actual knowledge of this excess usage in a June 27, 2014, letter to the Florida Department of Environmental Protection ("FDEP"), stating: "Recently it was brought to my attention that we are going over the one ton limit."

155.    In that exact same document, Fleischhacker made a misrepresentation to evade the 1-ton mandate by falsely claiming the facility was only subject to the 10-ton "aeration chamber" rule, stating: "...the EPA has set a limit of 10-tons of EO on aeration chambers. ACS is well below that."

156.    To support this fraudulent representation, Fleischhacker repeatedly claimed to regulators (including in the 2014 letter) that "ACS uses 1/10th of gas that a traditional chamber sterilizer would," knowingly omitting the material fact that any such traditional sterilizer was

36

required by federal law to capture and destroy 99.0 to 99.9% of its emissions (depending on annual tonnage usage), whereas ACS captured 0%.

157.    Fleischhacker, on behalf of ACS, repeated this same representation in the 2019 AGP re-registration, again claiming the 10-ton aeration room limit applied and that no controls were needed.

158.    This defense was a knowing falsehood. The EPA (in the 2019 ANPRM) confirms ACS's "single-item" process is subject to the 1-ton mandate, and ACS's own 2023 filings finally admitted the equipment was, in fact, "six identical combined sterilization chambers" operating as a "single-chamber combined sterilization/aeration process".

159.    As a direct result of hitting the 1-ton NESHAP trigger in 2013 and mischaracterizing its equipment, ACS failed to install the federally mandated 99% effective emission control technology for approximately a decade.

160.    This failure to comply constituted a routine violation of their Air General Permit, which required adherence to Subpart O. Upon information and belief, the facility routinely exceeded its 1-ton threshold, including in 2013 (2,358 lbs.) and 2018 (2,268 lbs.), yet failed to install the mandated controls.

161.    During this entire period of non-compliance, safer alternatives (like the dry-bed scrubbers finally installed in 2023) were commercially available, customary in the industry, and technically feasible to install.

162.    The EtO facility was located directly within a densely populated area surrounded by homes, schools, and businesses, creating a foreseeable zone of risk.  The harm from these uncontrolled emissions was exacerbated by the EtO Facility's design, which included an unusually short exhaust stack and the emission temperature. Specifically, the EtO Facility's stack emissions

37

were released from a 31-foot exhaust stack at a temperature of approximately 108°F, only marginally warmer than the ambient South Florida air. This design resulted in a low-buoyancy plume that failed to disperse into the upper atmosphere. Instead, the emissions were subject to a "downwash effect," causing the concentrated EtO to fall and spread at ground level.

## COUNT VII
### (Claim Against ACS for Negligence Per Se)

163.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

164.    At all relevant times, Fla. Stat. §403.161 prohibited ACS from violating or failing to comply with any rule, regulation, or permit issued by the FDEP. At all relevant times, ACS was subject to the NESHAP regulation, 40 C.F.R. §63.362(c) (Subpart O), which was adopted and enforced by the FDEP and mandated 99% emission controls on a chamber utilized for a single-chamber combined sterilization/aeration process at a facility using 1 ton or more of EtO annually. ACS's Air General Permit (AGP) required adherence to all applicable regulations, including Subpart O. As alleged in detail above, ACS knowingly, intentionally, and continuously violated these regulations and its permit. ACS's EtO usage surpassed the 1-ton NESHAP trigger in 2013. ACS admitted actual knowledge of this fact in Fleischhacker's 2014 letter to the FDEP. Despite knowing the 1-ton mandate applied, ACS failed to install the federally mandated 99% effective emission control technology for approximately a decade (2013–July 2023). This failure was a direct violation of §63.362(c) and, consequently, a violation of Fla. Stat. §403.161. ACS concealed this ongoing violation by fraudulently mischaracterizing the nature of its single-chamber combined sterilization/aeration process which were subject to the 1-ton mandate as a bifurcated process involving separate aeration rooms which are subject only to a 10-ton mandate.

38

165.    These federal and state air pollution regulations were specifically designed to protect the health, safety, and welfare of the public, including residents living in close proximity to hazardous air pollutant sources, from involuntary toxic exposure. Because the Exposure Area suffered from hazardous concentrations of EtO emitted from the EtO Facility as more particularly alleged above, Estate Plaintiff is a member of the specific class of persons these regulations were intended to protect.

166.    These regulations were specifically designed to prevent the exact type of harm Estate Plaintiff suffered: serious bodily injury, genetic damage, and cancer resulting from chronic exposure to carcinogenic air pollution (EtO).

167.    ACS's violation of these statutes and regulations constitutes Negligence Per Se. This statutory violation, the decade-long failure to install the 99% controls mandated by law, was the proximate and substantial cause of the massive, uncontrolled, and unabated release of EtO into Estate Plaintiff's Decedent's neighborhood. This resulting chronic exposure proximately and substantially caused Estate Plaintiff's Decedent's cancer and death.

168.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

WHEREFORE, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT VIII
### (Claim Against ACS for General Negligence)

169.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

170.    ACS had a heightened duty to exercise reasonable care in the operation of its EtO Facility to avoid causing foreseeable harm to those in the surrounding community.

171.    As more specifically alleged above, ACS's conduct, namely, the handling, processing, and large-scale emission of EtO, a known human carcinogen, mutagen, and genotoxic gas, foreseeably created a broad "zone of risk" posing a general threat of grave harm to others, including Estate Plaintiff.

172.    This foreseeable zone of risk included the surrounding residential neighborhoods, schools, and businesses where Estate Plaintiff lived and recreated, as more specifically alleged above.

173.    Given that the risk to be perceived was catastrophic (cancer and genetic damage), ACS's duty to undertake precautions to prevent that harm was correspondingly high.

174.    ACS breached this heightened duty of care and failed to exercise reasonable care. At all relevant times, ACS knew or should have known that EtO is a noxious, toxic, poisonous, and highly carcinogenic gas, and that substantial stack and fugitive emissions were being released from the EtO Facility into surrounding neighborhoods, posing a foreseeable risk of grave harm.

40

175.    As more particularly alleged above, ACS's negligence includes, but is not limited to, a course of conduct which, in summary, constitutes a decade-long failure to comply with the federal emission control mandates, misrepresentation of its process to regulators, the negligent failure to earlier install available and customary abatement technology.

176.    Additionally, ACS's negligence included, but was not limited to, the following acts and/or omissions: (a) locating the EtO facility in a densely populated area surrounded by homes, schools, and businesses; (b) employing an unusually short exhaust stack and discharging EtO at temperatures only marginally above ambient conditions, causing the resulting plume to exhibit limited buoyancy, fail to disperse into the upper atmosphere, and instead remain concentrated at ground level in the surrounding neighborhoods (a "downwash effect"); (c) emitting dangerous, excessive, unnecessary, and/or unsafe volumes of EtO, as more specifically alleged above; (d) failing to install any emission control devices for over a decade, allowing nearly all EtO emissions to escape uncontrolled, despite knowing that scrubbers and catalytic oxidizers were commercially available; (e) failing to adopt, implement, and/or enforce reasonable and sufficient measures to mitigate or reduce EtO emissions to non-harmful levels, such as failing to install dry-bed scrubbers, catalytic oxidizers, and negative-pressure aeration rooms, which were customary in the sterilization industry; (f) failing to adequately track, record, and/or monitor the amounts or levels of EtO emissions, including failing to report and prevent fugitive emissions; (g) failing to adequately, accurately, and thoroughly report the levels of EtO being emitted to regulators; (h) misleading government entities as to the nature and extent of EtO usage, emissions, and venting type at the EtO Facility; (i) failing to obtain the proper permits based on accurate information; (j) concealing from the public the nature and extent of EtO usage and emissions from the EtO Facility; (k) failing to warn Estate Plaintiff and others in the surrounding community that they were being

41

exposed to hazardous levels of EtO; (l) failing to advise Estate Plaintiff and others that they were breathing in EtO and that the EtO Facility was emitting a known carcinogen; (m) failing to select and utilize safer, alternative methods to sterilize devices at the EtO Facility, or failing to investigate, study, or test such alternatives; (n) failing to adequately study or test the effects of the Facility's EtO emissions on community air quality and public health; (o) failing for 13 years from the opening of the EtO Facility to report to regulators that its sterilization process involved the use of a "single-chamber combined sterilization/aeration process," which would have required the installation of emission control devices as early as 2014; (p) negligent training, supervision, and retention of employees and agents responsible for operating the EtO Facility and controlling EtO emissions; and (q) placing its own economic interests above the health and well-being of Estate Plaintiff and the surrounding community by failing to update or upgrade equipment despite known risks.

177.     As a proximate and substantial result of ACS's negligent conduct, Estate Plaintiff was chronically exposed to hazardous levels of EtO in the Exposure Zone.  This resulting chronic exposure proximately and substantially caused Estate Plaintiff's Decedent's cancer and death.

178.     As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date

of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

179.    ACS knew or should have known that members of the public, including Estate Plaintiff, were within the foreseeable zone of risk and would foreseeably suffer injury because of ACS's failure to exercise reasonable care.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT IX
### (Claim Against LeeSar for Vicarious Liability Pursuant to Restatement of the Law, Torts, Section 427)

180.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

181.    At all relevant times, LeeSar engaged ACS as an independent contractor to sterilize Custom Packs and other medical devices using EtO at the EtO Facility.

182.    Restatement (Second) of Torts § 427 provides: "One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work... is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

183.    Florida courts recognize this principle, holding that a principal has a non-delegable duty when hiring a contractor to perform inherently dangerous work.

184.    The work LeeSar hired ACS to perform, the large-scale sterilization of medical devices using EtO, is an inherently dangerous activity under Florida law.

43

185.    The activity involves the processing and emission of EtO, a known noxious, mutagenic, and human carcinogenic gas, as more specifically alleged above.

186.    This work poses a "recognizable and substantial danger inherent in the work." As noted by Florida courts referencing legal treatises, the "emission of noxious gases into densely populated areas," which is precisely the work ACS performed for LeeSar in this location, is a classic example of an inherently dangerous activity.

187.    Given the EtO Facility's siting in a dense residential community, this work was such that "in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken."

188.    LeeSar, as a sophisticated medical distributor whose business required EtO sterilization, knew or had reason to know that the work it hired ACS to perform involved these "special dangers" inherent to emitting EtO in a populated area.

189.    As alleged more fully above in the Claim Against ACS for General Negligence, the contractor (ACS) failed to take reasonable precautions against this danger. This failure included, but was not limited to, operating for over a decade without any emission controls, failing to install industry-standard abatement systems like dry-bed scrubbers and catalytic oxidizers, and negligently designing the EtO Facility with a short stack that caused ground-level fumigation.

190.    Under § 427, LeeSar's duty as the principal employing ACS was to protect the community from these inherent dangers associated with utilizing EtO to sterilize Custom Packs was non-delegable.

191.    The Estate Plaintiff's Decedent's cancer and death were proximately and substantially caused by ACS's failure to take reasonable precautions against the special dangers

44

inherent in the work LeeSar hired it to perform as more particularly alleged in paragraphs 175 and 176 above which are hereby incorporated by reference as if set fully forth herein.

192.    As a proximate and substantial result of such failure, Estate Plaintiff sustained damages including: (a) Surviving Spouse's loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate's damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.Accordingly, LeeSar is vicariously liable to Estate Plaintiff for the full extent of these damages.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **LEESAR, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT X
### (Claim Against ACS for Negligent Hiring)

193.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as 150 through 162 and incorporates them herein as if fully set forth.

194.    At all times material hereto, ACS employed a Director or Vice-President of Sterilization Technologies (Fleischhacker) who was the senior corporate manager responsible for

the ultimate operational oversight of all EtO sterilization processes at the EtO Facility and possibly others operated by ACS. ACS also employed local managers, supervisors, and staff (including Manager Cook and Manager Walls) responsible for the day-to-day operation, management, and supervision of the EtO Facility.

195.    The sterilization director position was the key senior role responsible for designing sterilization protocols, ensuring emission safety, and overseeing all regulatory filings (although, upon information and belief, that position would be tasked with boots on the ground operations at the Eto Facility) while the local managers, supervisors and staff were responsible for executing those protocols and the safe handling of EtO.

196.    ACS owed a heightened duty to exercise reasonable care in the selection, hiring, training, and retention of all individuals placed in these critical roles, as their positions involved the direct oversight and handling of a highly noxious, toxic, volatile, and carcinogenic gas.

197.    ACS further owed a duty to refrain from hiring or retaining individuals in these positions of responsibility who were unfit, unqualified, or incompetent to safely perform their assigned duties and who posed a foreseeable risk of harm to surrounding residents.

198.    Upon information and belief, a reasonable and appropriate investigation by ACS into the background and qualifications of its prospective director, managers, supervisors, and employees would have revealed their unsuitability for such sensitive and hazardous work, including but not limited to: (a) lack of knowledge of EtO medical sterilization process regulations including state and federal environmental regulations; (b) lack of proper training in hazardous chemical handling and emission-control procedures; (c) a prior history of disregarding or ignoring safety standards; (d) lack of experience or qualifications in managing emissions of toxic substances; and (e) propensities toward prioritizing cost-cutting and profits over health and safety.

46

199.    Despite the clear risks involved, ACS failed to conduct such reasonable investigations and negligently hired, trained, and retained unqualified and unfit individuals to these critical roles.

200.    These unqualified and unfit managers and supervisors, upon information and belief, subsequently engaged in unsafe practices, including: (a) instructing employees to disregard safety protocols and inventory control (tank tracking) in order to maximize throughput and profits; (b) after the installation of scrubbers in 2023, disregarding emission-control protocols and failing to maintain or repair equipment necessary to prevent fugitive emissions; (c) failing to properly train employees to monitor emission concentrations; (d) permitting the improper handling and storage of EtO, resulting in uncontrolled releases of the toxic gas; (e) failing to warn surrounding residents of the toxic and carcinogenic nature of EtO emissions; (f) failing to properly categorize the chambers as a "single-chambers combined sterilization/aeration process" for purposes of avoiding emission control requirements as early as 2014 or before; and (g) failing to report the use of a "single-chambers combined sterilization/aeration process" to regulators, which impacted the allowable legal limit of EtO that could be used under its permit.

201.    By failing to conduct reasonable investigations and by hiring and retaining individuals unfit to safely perform their duties, ACS made negligent decisions that created a foreseeable and unreasonable risk of harm to Estate Plaintiff and the surrounding community.

202.    As a proximate and substantial result of ACS's negligent hiring, training, and retention, its unqualified and unfit employees engaged in the unsafe and reckless practices alleged above, causing hazardous levels of EtO to be released into the surrounding community and chronically exposing Estate Plaintiff to hazardous levels of carcinogenic EtO emissions in the Exposure Zone.

203.    This exposure proximately and substantially caused Estate Plaintiff's Decedent's cancer and death. As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT XI
### (Claim Against Philip Fleischhacker for Negligence and Gross Negligence)

204.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

205.    At all times material, Fleischhacker was the senior corporate manager responsible for the EtO Facility. Since at least 2009, he served as the Director of Sterilization Technologies and/or VP of Sterilization Technologies for ACS and, upon information and belief, after 2021, for OMI.

48

206.    In this role, Fleischhacker was and is the primary technical expert responsible for sterilization operations, emission systems, and regulatory compliance for the EtO Facility. He personally directed, managed, participated in, and oversaw the sterilization operations; personally submitted regulatory filings to the FDEP; and was the primary signatory on the documents that governed the EtO Facility's emissions.

207.    As the senior technical expert and regulatory manager personally directing an operation that handled and emitted massive quantities of a known human carcinogen directly adjacent to a dense residential community, Fleischhacker owed a personal, heightened duty of care to the Estate Plaintiff, as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated in a manner that would avoid unreasonable risk of harm. Fleischhacker breached his personal and heightened duty of care and acted with negligence and gross negligence. This negligence specifically includes, but is not limited to, the following personal acts and omissions: (a) grossly failing to ensure the facility complied with the federal 1-ton NESHAP mandate (40 CFR §63.362(c)) (i.e., installing emission controls due to excess EtO usage) despite his personal, written admission to the FDEP on June 27, 2014, that he knew the facility was "going over the one ton limit";  (b) negligently or intentionally misrepresenting the EtO Facility's compliance status to state regulators by claiming in that same 2014 letter that the facility was only subject to the 10-ton "aeration chamber" rule, a claim he knew, or as the senior technical expert should have known, was false; (c) furthering this misrepresentation by deceptively claiming ACS used "1/10th the gas" of traditional sterilizers, while negligently or intentionally omitting the material fact that traditional sterilizers were legally required to capture 99.0% to 99.9% of their emissions (depending on annual tonnage usage) while the EtO Facility captured 0%, such that ACS emitted ten-times to one-hundred-times the amount of EtO than such traditional sterilizing

49

operations; (d) repeating this fraudulent representation to regulators again in 2019; (e) failing, as the key technical manager, to properly categorize the EtO Facility's vents as a chamber utilized for single chamber combined sterilization/aeration process subject to the 1-ton rule, despite knowing the process and the law, and despite the company later admitting this was the correct categorization in its 2023 filings; (f) failing to utilize his operational oversight to install commercially available and customary abatement technology (scrubbers, etc.) that he knew would have mitigated the harm; and (g) personally overseeing a facility with a negligently designed "short stack" that he knew or should have known was causing ground-level fumigation of carcinogens in the adjacent neighborhood.

208.    These personal negligent acts and omissions by Fleischhacker, were committed within the course and scope of their employment with ACS, as well as his subsequent employment with OMI, and in furtherance of the business interest of ACS and OMI. Specifically, Fleischhacker's tortious conduct occurred within the scope of his employment because his actions meet all three prongs of the established legal test. The conduct was of the kind he was hired to perform, as his role as Director of Sterilization Technologies explicitly included managing regulatory compliance and making decisions about emission systems; therefore, his communications with the FDEP and his decisions regarding control technology were a direct, albeit improper, part of his assigned duties. Furthermore, these acts occurred substantially within the authorized time and space limits of his job, as they were carried out during normal work hours from his corporate office using company resources. Most importantly, his actions were activated at least in part by a purpose to serve the employer, as the clear motive for evading the installation of mandated controls was to save ACS, and later OMI, from incurring significant capital

50

expenditures and operational costs, a decision that directly served their financial interests by maximizing profits.

209.    These personal negligent acts and omissions by Fleischhacker, which constitute a profound breach of his professional duty of care, were the proximate and substantial cause of the EtO Facility's decade-long regulatory violation and the resulting uncontrolled release of carcinogenic EtO into the community. As more fully alleged above, the resulting chronic exposure to EtO from the EtO Facility was a substantial cause of Estate Plaintiff's Decedent's cancer and death.

210.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **PHILIP FLEISCHHACKER**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

51

## COUNT XII
### (Claim Against Manager Cook for Negligence)

211.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150

through 162 and incorporates them herein as if fully set forth.

212.    From approximately 2009, even before the Eto Facility was operational, until in or

about 2018, Manager Cook was the on-site supervisor and/or plant manager of the EtO Facility,

routinely exercising direct, day-to-day operational control over the sterilization processes,

equipment, and emissions, when Fleischhacker was not on the premises.

213.    In this role, Manager Cook personally participated in the tortious conduct alleged

above. He was the named "Facility Contact" on the 2009 initial AGP permit submission (which

also listed "None required" for emission controls) and, critically, was the "Facility Contact"

(alongside Fleischhacker) on both the June 27, 2014 Letter to the FDEP (that admitted crossing

the 1-ton limit but argued the 10-ton rule applied) and the 2019 AGP Re-Registration (that repeated

this fraudulent representation).

214.    As the individual with direct, on-site operational control of a facility emitting a

known carcinogen, Manager Cook owed a personal, heightened duty of care to the Estate Plaintiff,

as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated

in a manner that would avoid unreasonable risk of harm.

215.    Manager Cook breached this personal duty of care and acted with negligence and

gross negligence. This negligence includes, but is not limited to: (a) personally overseeing the

daily, unabated venting of hazardous and carcinogenic EtO for nearly a decade; (b) personally

participating in the submission of fraudulent regulatory filings in 2014 and 2019 that he knew, or

as the plant manager should have known, falsely characterized the EtO Facility's vents to evade

the mandatory 1-ton NESHAP control requirement; (c) failing to take any reasonable step to install

52

commercially available emission controls and abatement technology (i.e., scrubbers), despite knowing the EtO Facility was violating the 1-ton trigger since at least 2014;  (d) upon information and belief, systematically disregarding and failing to implement proper inventory controls (i.e., allowed lax record keeping) in order to maximize facility throughput at the expense of safety and regulatory compliance;  (e) upon information and belief, failing to properly train and supervise on-site staff in the safe handling of hazardous chemicals, and permitting the improper handling and storage of EtO, resulting in uncontrolled releases; and  (f) failing to warn the surrounding community of the dangers he was actively overseeing.

216.    These personal negligent acts and omissions by Manager Cook were committed within the course and scope of his employment with ACS. Specifically, the conduct was of the kind he was hired to perform; as the on-site Plant Manager exercising "direct, day-to-day operational control," his responsibilities inherently included overseeing facility emissions, ensuring regulatory compliance, and managing staff. Therefore, his management of these specific duties, however negligent, was the work he was hired to perform. Furthermore, these negligent acts occurred substantially within the authorized time and space limits of his job, taking place at the EtO facility throughout his tenure. Critically, his actions were activated at least in part by a purpose to serve the employer, as his entire pattern of conduct, from overseeing unabated venting and failing to train staff to participating in misleading regulatory filings, was systematically undertaken to maximize facility throughput and avoid costly safety measures, directly serving the financial interests of his employer, ACS.

217.    These personal negligent acts and omissions by Manager Cook were a proximate and substantial cause of the EtO Facility's decade-long uncontrolled release of carcinogens.  As

53

more fully alleged above, the resulting chronic exposure to EtO from the EtO Facility was a substantial cause of Estate Plaintiff's Decedent's cancer and death.

218.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **ROBERT COOK**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XIII
### (Claim Against Manager Walls for Negligence)

219.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

220.    From approximately 2019 to the present, Manager Walls has served as the on-site plant manager and/or general manager of the EtO Facility, exercising direct, day-to-day operational control over the sterilization processes, equipment, and emissions. In this role, Manager Walls personally participated in the tortious conduct alleged above, including serving as

54

the "Facility Contact" and "Authorized Representative" for ACS and/or OMI during the critical period when the EtO Facility's continuing, unlawful, decades-long thwarting of federal regulations came to an end.

221.    As the individual with direct, on-site operational control of the facility, Manager Walls owed a personal, heightened duty of care to the Estate Plaintiff, as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated in a manner that would avoid unreasonable risk of harm. Manager Walls breached this personal duty of care and acted with negligence and gross negligence. This negligence includes, but is not limited to: (a) personally overseeing the continued, unabated venting of hazardous EtO (from 2019 until July 2023), thereby continuing the regulatory violation established by her predecessors;  (b) upon information and belief, failing to enforce protocols to minimize fugitive emissions, particularly after the 2023 scrubbers were installed; (c) upon information and belief, continuing the lax enforcement of EtO record-keeping to maximize throughput; (d) upon information and belief, failing to properly train and supervise staff in hazardous chemical handling and permitting the improper handling and storage of EtO; and (e) failing to warn the surrounding community of the dangers she was actively overseeing. These personal negligent acts and omissions by Manager Walls were a proximate and substantial cause of the EtO Facility's continued uncontrolled (pre-July 2023) release of carcinogens, which proximately and substantially caused and/or contributed to Estate Plaintiff's diagnosed cancer.

222.    These personal negligent acts and omissions by Manager Walls, were committed within the course and scope of their employment with ACS, as well as her subsequent employment with OMI, and in furtherance of the business interest of ACS and OMI. Specifically, Manager Walls' negligent conduct occurred within the scope of her employment because her actions meet

55

all three prongs of the established legal test. The conduct was of the kind she was hired to perform; as the on-site plant manager exercising "direct, day-to-day operational control," her core responsibilities included overseeing facility emissions, managing staff, and making decisions regarding abatement technology. Therefore, her management of these specific duties, however negligent, was precisely the work for which she was hired. Furthermore, these negligent acts occurred substantially within the authorized time and space limits of her job, as they took place at the EtO facility during her tenure. Critically, her actions were activated at least in part by a purpose to serve the employer, as her entire pattern of conduct, from continuing the unabated venting through and knowingly failing to install necessary emission controls until mid-2023 to disregarding protocols for fugitive emissions and record-keeping, was designed to maximize throughput and avoid capital expenditures, decisions that directly served the financial interests of her employers, ACS and OMI.

223.    These personal negligent acts and omissions by Manager Walls were a proximate and substantial cause of the EtO Facility's continued uncontrolled (pre-July 2023) release of carcinogens. As more fully alleged above, the resulting chronic exposure to EtO from the EtO Facility was a substantial cause of Estate Plaintiff's Decedent's cancer and death.

224.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date

56

of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **PENNY WALLS,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XIV
### (Claim Against ACS for Vicarious Liability
### for Pre-Acquisition Negligence of Fleischhacker)

225.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

226.    At all times prior to December 21, 2021, an employer-employee relationship existed between ACS and Fleischhacker, whereby ACS was his sole lawful employer and he exercised ultimate operational oversight of the EtO Facility as more particularly alleged in paragraphs 205 and 206 which are incorporated herein by reference.

227.    During this period, Fleischhacker committed tortious conduct. As more particularly alleged in paragraph 207 which is incorporated herein by reference. Such conduct sounding in negligence included, but was not limited to, knowingly failing to comply with the federal 1-ton NESHAP mandate for emission controls after admitting the facility exceeded the usage limit; actively misrepresenting the facility's compliance status to regulators to evade these requirements; and overseeing a negligently designed "short stack" that caused ground-level fumigation of carcinogens in the adjacent community.

228.     All such conduct was committed within the course and scope of Fleischhacker's employment with ACS and in furtherance of the business interest of ACS as more particularly alleged in paragraph 208, which is incorporated herein by reference.

229.     Fleischhacker's tortious conduct proximately and substantially caused Estate Plaintiff's damages, as more particularly alleged in paragraph 209 which is incorporated herein by reference.

230.     Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously liable for the damages caused by the negligence of its employee, Fleischhacker.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages arising from the pre-acquisition negligence of its employee, Defendant, Philip Fleischhacker, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT XV
### (Claim Against OMI and ACS for Vicarious Liability for Post-Acquisition Negligence of Fleischhacker)

231.     Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

232.     On and after December 21, 2021, a joint employer-employee relationship existed between OMI, ACS, and Fleischhacker as, upon information and belief, OMI provided his remuneration and held the ultimate authority to hire, fire, and discipline him, while ACS directed his day-to-day duties and managed his work related to the EtO Facility.

58

233.    During this period, Fleischhacker continued to exercise ultimate operational oversight of the EtO Facility as more particularly alleged in paragraphs 205 and 206 which are incorporated herein by reference.

234.    During this period, Fleischhacker continued to commit tortious conduct as more particularly alleged in paragraph 207 which is incorporated herein by reference. This ongoing negligence included, but was not limited to, his failure to remedy the long-standing regulatory violations he established and his continued oversight of a facility with a negligently designed emission system that he knew or should have known was causing harm to the community.

235.    All such conduct was committed within the course and scope of Fleischhacker's joint employment with ACS and OMI, and in furtherance of the business interest of ACS and OMI, as more particularly alleged in paragraph 208, which is incorporated herein by reference.

236.    Fleischhacker's tortious conduct proximately and substantially caused Estate Plaintiff's damages, as more particularly alleged in paragraph 209 which is incorporated herein by reference.

237.    Accordingly, as a direct and proximate result of the foregoing, OMI and ACS are jointly and severally liable for the damages caused by the negligence of their employee, Fleischhacker.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment holding Defendant, **OWENS & MINOR, INC**., and Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., jointly and severally liable for compensatory damages arising from the post-acquisition negligence of their employee, Defendant, Philip Fleischhacker, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XVI
### (Claim Against ACS for Vicarious Liability
### for Negligence of Manager Cook)

238.     Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

239.     During his employment from approximately 2010 through 2019, an employer-employee relationship existed between ACS and Manager Cook, whereby ACS was his sole lawful employer and he exercised direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 212 which is incorporated herein by reference.

240.     During this period, Manager Cook committed tortious conduct. As more particularly alleged in paragraphs 213-215 which are incorporated herein by reference. Such conduct sounding in negligence included, but was not limited to, personally overseeing the daily, unabated venting of hazardous and carcinogenic EtO for nearly a decade; participating in the submission of fraudulent regulatory filings to evade mandatory emission controls; and failing to warn the surrounding community of the dangers he was actively overseeing.

241.     All such conduct was committed within the course and scope of Manager Cook's employment with ACS and in furtherance of the business interest of ACS, as more particularly alleged in paragraph 216, which is incorporated herein by reference.

242.     Manager Cook's tortious conduct proximately and substantially caused Estate Plaintiff's damages, as more particularly alleged in paragraphs 217 and 218 which are incorporated herein by reference.

243.     Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously liable for the damages caused by the negligence of its employee, Manager Cook.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages arising from the negligence of its employee, Defendant, Robert Cook, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XVII
### (Claim Against ACS for Vicarious Liability for Pre-Acquisition Negligence of Manager Walls)

244.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

245.    From approximately 2019 until December 21, 2021, an employer-employee relationship existed between ACS and Manager Walls, whereby ACS was her sole lawful employer and she exercised direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 220 which is incorporated herein by reference.

246.    During this period, Manager Walls committed tortious conduct. As more particularly alleged in paragraph 221, which is incorporated herein by reference. Such conduct sounding in negligence included, but was not limited to, personally overseeing the continued, unabated venting of hazardous EtO, thereby continuing the regulatory violation established by her predecessors; continuing the lax enforcement of EtO record-keeping to maximize throughput; and failing to warn the surrounding community of the dangers she was actively overseeing.

247.    All such conduct was committed within the course and scope of Manager Walls's employment with ACS and in furtherance of the business interest of ACS as more particularly alleged in paragraph 222, which is incorporated herein by reference.

248.    Manager Walls's tortious conduct proximately and substantially caused Estate Plaintiff's damages, as more particularly alleged in paragraphs 223 and 224 which are incorporated herein by reference.

249.    Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously liable for the damages caused by the negligence of its employee, Manager Walls.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages arising from the pre-acquisition negligence of its employee, Defendant, Penny Walls, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XVIII
### (Claim Against OMI and ACS for Vicarious Liability for Post-Acquisition Negligence of Manager Walls)

250.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

251.    On and after December 21, 2021, a joint employer-employee relationship existed between OMI, ACS, and Manager Walls as, upon information and belief, OMI provided her remuneration and held the ultimate authority to hire, fire, and discipline her, while ACS directed her day-to-day duties and managed her work related to the EtO Facility.

252.    During this period, Manager Walls continued to exercise direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 220 which is incorporated herein by reference.

62

253.    During this period, Manager Walls continued to commit tortious conduct as more particularly alleged in paragraph 221 which is incorporated herein by reference. This ongoing negligence included, but was not limited to, personally overseeing the continued, unabated venting of hazardous EtO from the facility until July 2023, and failing to enforce protocols to minimize fugitive emissions, particularly after the 2023 scrubbers were installed.

254.    All such conduct was committed within the course and scope of Manager Walls's joint employment with ACS and OMI, and in furtherance of the business interest of ACS and OMI, as more particularly alleged in paragraph 222, which is incorporated herein by reference.

255.    Manager Walls's tortious conduct proximately and substantially caused Estate Plaintiff's damages, as more particularly alleged in paragraphs 223 and 224 which are incorporated herein by reference.

256.    Accordingly, as a direct and proximate result of the foregoing, OMI and ACS are jointly and severally liable for the damages caused by the negligence of their employee, Manager Walls.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment holding Defendant, **OWENS & MINOR, INC**., and Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, jointly and severally liable for compensatory damages arising from the post-acquisition negligence of their employee, Defendant, Penny Walls, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XIX
### (Claim Against Croci for Negligence)

257.    Estate Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

258.    From 2010 to 2015 Croci owned the real property located at 11600 Adelmo Lane, Fort Myers, Florida 33966 (the "Building").

259.    The Building was divided into two suites, with, upon information and belief, Croci leasing possession of Suite 1 to a related business entity and also using it as its main office address.

260.    Upon information and belief, from at least 2010 through 2015, Croci leased, permitted, or otherwise allowed ACS to operate its EtO Facility from Suite 2 of the Building.

261.    Croci owed a duty to Estate Plaintiff and to the public residing in the vicinity of the Building to exercise reasonable care in the ownership, leasing, and control of the Building, and to refrain from allowing its Building to be used in a manner that foreseeably created unreasonable risks of harm to others off the property. This duty was owed both prior to and after entry into the lease with ACS.

262.    Croci, both before and after the execution of the lease, knew or should have known of the intention to install and actual installation of single chambers, vents, exhaust vents, exhaust fans, and 31-foot stacks in Suite 2. Likewise, Croci knew or should have known that no emission control devices were to be or were, in fact, connected to the emission system exhausting EtO directly into the air.

263.    After entry into the lease, as a landlord on site, Croci would have had occasion to enter Suite 2. Since at least 1984, OSHA required employers to post conspicuous warning signs wherever employees might be exposed to EtO. The Ethylene Oxide Standard, 29 C.F.R. § 1910.1047 (adopted June 22, 1984, 49 Fed. Reg. 25734), expressly mandates that such signs bear

64

the word "DANGER" and state: "ETHYLENE OXIDE, CANCER HAZARD AND REPRODUCTIVE HAZARD. AUTHORIZED PERSONNEL ONLY." In addition, OSHA's general signage rule, 29 C.F.R. § 1910.145 (amended Feb. 10, 1984, 49 Fed. Reg. 5322), required that danger signs be legible and readable from at least five feet away.

264.    Thus, after entry into the lease, given these longstanding federal requirements, Croci, as ACS's landlord, knew or should have known of the significant dangers posed by EtO and its carcinogenic and reproductive hazards.

265.    Based on the foregoing, Croci knew or should have known this carcinogenic chemical, namely EtO, was being spewed into the surrounding neighborhood.

266.    Croci knew or should have known that allowing the Building to be used 24-hours a day, 365-days a year, as a large-scale[2] emitter of EtO into the atmosphere, a known hazardous and carcinogenic chemical, without no effective emissions controls, created a foreseeable risk of harm to people in the surrounding community.

267.    Croci had a duty of reasonable care not to expose the people in the nearby communities to the zone of danger created by the EtO emissions.  Such duty was also informed by the high degree of harm presented by the release of such noxious gas into such a populated area.

268.    Croci also owed a duty to Estate Plaintiff because they retained significant control over portions of the EtO Facility, including the roof, exterior, and other structural elements, and knew or should have known of the dangerous conditions existing at the EtO Facility when the leases were executed.

---

[2] While ACS would tout their gas-in-bag sterilization process as utilizing only 10% of the EtO of traditional sterilization facilities, due to ACS avoidance of regulatory mandates to install emission controls, the EtO Facility in fact, emitted 10 times the amount of EtO into the atmosphere than such traditional facility.  It was, in fact, a large-scale emitter of EtO.

269.    Croci breached its duty of care by, among other things: (a) leasing or permitting its Building to be used for inherently and/or abnormally dangerous EtO sterilization without requiring adequate emission controls; (b) failing to investigate or ensure that ACS's operations complied with reasonable health and safety practices; (c) failing to warn residents in the community, including Estate Plaintiff, of the dangerous emissions originating from the Building; and (d) continuing to allow the hazardous operations to occur despite actual and/or constructive knowledge of the risks.

270.    As a direct and proximate result of Croci's negligence, harmful emissions routinely migrated from the Building, both stacks emissions and fugitive emissions (from the entry and exit points of the Building's habitable envelope), into the surrounding community, contaminating the air in and around Estate Plaintiff's Property, school, and/or place of work. This resulted in the Estate Plaintiff's Decedent's long-term, involuntary inhalation of EtO into Estate Plaintiff's Decedent's lungs, resulting in it entering the blood stream and being carried throughout Estate Plaintiff's Decedent's body. The chronic cellular exposure to EtO resulted in damage to the Estate Plaintiff's Decedent's DNA. In turn, as more particularly explained above, this damaged DNA replicated within Estate Plaintiff's body and was ultimately a substantial cause of Estate Plaintiff's Decedent's cancer and death.

271.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against

the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **CROCI REAL ESTATE, LLC**, for compensatory damages, together with interest, costs, attorney's fees as allowed by law, and such other relief as this Court deems just and proper.

**PART 4**
**CORPORATE PARENTAL LIABILITY**

**Allegations Common to Corporate Parental Liability Claims**

272.    OMI is a Fortune 500 global healthcare solutions company that publicly represents itself as a fully integrated enterprise that "incorporates product manufacturing, distribution support and innovative technology services to deliver significant and sustained value across the breadth of the industry."

273.    OMI has organized its operations into two primary, reportable business segments: Products & Healthcare Services (PHS) and Patient Direct.

274.    Upon information and belief, in December 2021, OMI acquired ACS through a reverse triangular merger under the laws of the state of Minnesota. To execute this, OMI created a shell subsidiary, Cleanroom Merger Sub, Inc., which was merged into ACS. ACS survived the merger as a corporate entity, but all of its prior shares were extinguished and O&M Halyard, another of OMI's wholly-owned subsidiaries, became ACS's sole shareholder.

275.    Upon information and belief, OMI deliberately structured the acquisition to place ACS under O&M Halyard as an intermediary. The selection of O&M Halyard was operationally

67

convenient, as OMI had partnered with ACS for decades using O&M Halyard-branded products, providing a business-friendly pretext for a legal structure designed to create a layer of corporate distance between OMI and ACS's operations and liabilities.

276.    OMI's public-facing narrative of the acquisition completely omitted O&M Halyard's role, instead presenting it as a direct and seamless integration. In announcing the acquisition, OMI's CEO Edward Pesicka stated: "Bringing into Owens & Minor the capabilities that American Contract Systems offers in the CPT (custom procedure tray) market will further strengthen our ability to meet and exceed our customers' collective needs for surgical procedure trays."

277.    Industry press further reported that ACS offered a "unique, proprietary, environmentally sound sterilization process" that OMI intended to fold directly into its PHS segment as a core component of its kitting services.

278.    Following the acquisition, ACS, including the EtO Facility's sterilization operations were fully integrated into OMI's PHS segment, which OMI describes to its investors as "vertically-integrated," stating that "we manufacture…from raw material all the way to finished goods before transferring the products to our distribution center network."

279.    OMI has expressly acknowledged in its SEC filings that "[c]ertain of our operations engage in Ethylene Oxide sterilization of medical products either directly or indirectly through third-parties" and specifically warned its investors that its involvement in EtO sterilization could subject it to legislative or regulatory action or litigation."

280.    OMI communicates directly with the FDEP regarding EtO permitting for the EtO Facility. In 2023, OMI's Director of Environmental, Health & Safety, William Swanger, submitted an Air Pollution Source Test to FDEP under OMI's authority on behalf of the EtO Facility.

281.    Individuals who hold themselves out publicly as OMI employees, and who therefore, on information and belief, are OMI employees, have been directly responsible for the daily operations and management of the EtO Facility. These include, but are not limited to, Fleischhacker (Director, Sterilization ACS) and Manager Walls (Plant Manager). Upon information and belief, these key individuals utilize OMI-supplied email addresses for their corporate communications, are integrated into OMI's information technology infrastructure, and identify publicly and internally as OMI employees, demonstrating OMI's direct Human Resource and Information Technology control over the EtO Facility's key management.

282.    Upon information and belief, Fleischhacker was not new to this role; he was the same VP/Director of Sterilization Technologies who had purposefully directed and managed the EtO Facility's operations and regulatory filings since at least 2009. He was the key manager responsible for the decade-long regulatory violation alleged in paragraphs 150 through 162, which are incorporated herein by reference as if set forth fully, including the knowing failure to install mandated controls after admitting the facility was "over the one ton limit" and the fraudulent misrepresentations made to the FDEP. When OMI acquired ACS in December 2021, it knowingly retained Fleischhacker to continue directing the exact same sterilization operations on behalf of OMI.

283.    Further evidencing the complete integration of management and OMI's disregard for ACS's separate corporate form, the individual who served as the Executive Vice President of ACS, Charlie Persby, following OMI's acquisition of ACS publicly identifies himself first and foremost as an Owens & Minor executive. On his professional LinkedIn profile (as published on contactout.com), Mr. Persby lists his title as "Vice President, Corporate Accounts" for Owens & Minor, a position he has held since approximately the time of the ACS acquisition, as well as

69

"General Manager" of ACS, as if ACS is a division of OMI and not separate from OMI. That is, his primary, public-facing title and affiliation are with the parent company, integrating him directly into OMI's corporate management structure. This is not the profile of a president of an independent subsidiary, but of a divisional manager operating within a single, unified enterprise, demonstrating OMI's treatment of ACS as a mere component of its corporate structure rather than a distinct legal entity. This is underscored by a photograph in Business Wire at an event where OMI was honored where Mr. Persby is in a group photo of OMI executives with his title being listed as "VP and General Manager, ACS".

284.    Upon information and belief, despite being the sole shareholder of ACS, O&M Halyard exercises no independent operational or managerial control over ACS and has failed to observe corporate formalities in its relationship with OMI. O&M Halyard has acquiesced to and permitted its parent, OMI, to exercise all managerial, operational, financial, and regulatory control over ACS directly. Except as may be alleged below, O&M Halyard thus manifests no separate corporate interest from its parent, OMI, and functions merely as a passive intermediary and insulating layer in OMI's corporate structure.

285.    Further evidencing OMI's disregard for ACS's separateness and its projection of corporate identity into ACS facilities, upon information and belief, OMI supplied the EtO Facility with a poster celebrating OMI's 140th anniversary. This poster was displayed on the EtO Facility's wall in honor of the parent company's milestone. The distribution and display of such corporate anniversary materials at the facility demonstrate OMI's manifestation that the Fort Myers operations were part of OMI's own enterprise, not those of an independent subsidiary.

286.    Despite OMI's complete operational and regulatory control at the federal level (FDA), OMI ensured that state-level environmental permits and regulatory communications with

70

the FDEP and EPA were maintained exclusively in the name of ACS. Upon information and belief, this was a deliberate and bifurcated strategy: OMI leveraged its own name and authority with the FDA for product and quality control, while simultaneously using the subsidiary's name on state environmental permits to create a superficial record of compliance designed to shield the parent company from direct responsibility for environmental torts.

287.    OMI, not ACS, was identified as the responsible entity in FDA compliance proceedings. Specifically, on November 1, 2024, the FDA issued a formal Warning Letter directly to OMI's CEO at its Virginia headquarters under the designation "Owens & Minor, Inc. dba American Contract Systems, Inc.," thereby acknowledging OMI as the actual operator of the facility.  Upon information and belief, this terminology originated as a result of OMI's interaction with the FDA.

288.    Upon information and belief, OMI involves itself with the operation of its ACS medical sterilization facilities so as to ensure the vertical integration of the operation with its Products & Healthcare Services. Further, upon information and belief, OMI directs human resource management, regulatory direction, information technology, emission control technology, legal support and other necessary day-to-day adjuncts of ACS operations.

289.    OMI's direct command and control is further evidenced by its management of product safety and recall activities. In multiple instances, including recalls dated August 7, 2024, and September 1, 2023, the FDA record shows that while ACS was the nominal recalling firm, it was OMI that issued the "URGENT: MEDICAL DEVICE FIELD CORRECTION" to customers and apparently served as the point of contact.

71

290.    OMI's conduct publicly reflects that it directly conducts substantial business in Florida. OMI's corporate website and other professional networking sites actively advertise open positions for multiple "OMI employees" in Florida.

291.    Furthermore, OMI's own corporate website claims that OMI has three major distribution centers in Florida (Jacksonville, Sunrise, and Gainesville), with no suggestion that the distribution centers belong to a separate subsidiary company. Such public facing representations are admission by OMI that it has a continuous physical business presence in the state.

292.    OMI's own SEC filings confirm that it treats itself and its numerous subsidiaries as a single, consolidated enterprise, referring collectively to "Owens & Minor, Inc. and subsidiaries ('Owens & Minor,' 'Company,' 'we,' and 'our')."

293.    Upon information and belief, ACS is inadequately capitalized relative to the foreseeable multimillion-dollar liabilities arising from its EtO emissions, with, again, upon information and belief, its revenues and profits being swept into OMI's consolidated enterprise from time to time and being utilized as an OMI asset as a pledge in collateral for OMI's broader corporate financing activities as reflected in OMI's annual reports for 2022 and 2023. its assets are or were used as collateral for OMI's broader corporate financing activities.

294.    Upon information and belief, after earlier EtO litigation was commenced by two law firms unrelated to the undersigned, OMI engaged in a pattern of concealing evidence by scrubbing at least two distinct and critical categories of public-facing documents from its corporate website: first, the official December 16, 2021 press release announcing the ACS acquisition, and second, its separate investor-facing webpage that explicitly stated ACS had been "fully integrated." This stands in stark contrast to OMI's more detailed public filings for other major

acquisitions, such as that of Apria, Inc., for which the full merger agreement was filed as a public

exhibit.

295.    In its Q2 2025 financial disclosures, OMI reclassified its entire PHS segment,

including ACS and O&M Halyard, as "discontinued operations" and "held-for-sale," recording a

$649.1 million loss on the classification and a $106.4 million goodwill impairment.

296.    Upon information and belief, this massive $755.5 million write-down is not an

ordinary operating loss. Rather, upon information and belief, it is a fair-value accounting

adjustment compelled by "information received during our sale process." See Owens & Minor,

Inc., Quarterly Report (Form 10-Q), Note 3 (June 30, 2025). Upon information and belief, the

coincidence of the write-down, the sale, and the ongoing EtO litigation raise the specter that this

is a sober, market-based assessment by potential acquirers of the substantial contingent liabilities

tied to ACS's EtO emissions. The steep discount suggests a conscious recognition by the market,

and by OMI itself, of the reality of the pollution, the legitimacy of the resulting claims, and the

significant likelihood that legal responsibility will attach to OMI as the ultimate parent. The write-

down serves as a financial acknowledgment of the very liabilities OMI now seeks to surgically

remove from its balance sheet.

297.    OMI has since publicly stated it is in the final stages of the PHS divestiture as part

of a strategy to become a "pure-play Patient Direct" company, a move designed to shed the

business segment containing its primary EtO-related liabilities.[3]

---

[3] As of the filing of this Complaint, the final structure of OMI's divestiture of its PHS
segment is not fully known from public records. Should discovery reveal or public filings confirm
that this divestiture closed prior to this filing, Estate Plaintiff will seek leave to amend to add
claims against any relevant party, including OMI and/or the acquiring entity, for Successor
Liability under the exceptions articulated in Bernard v. Kee Mfg. Co., Inc., 409 So. 2d 1047, 1049
(Fla. 1982)(c-SPC), and for Fraudulent Transfer under the Florida Uniform Fraudulent Transfer

## COUNT XX
### (Claim Against OMI for Vicarious Liability Based on Agency)

298.     Estate Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297, and incorporates them herein as if fully set forth.

299.     An agency relationship under Florida law is established where the principal acknowledges the agent will act for it, the agent accepts the undertaking, and the principal retains control.

300.     In this matter, the elements of an actual agency relationship are established by the common allegation as to OMI and O&M Halyard, which demonstrate that ACS "manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation."

301.     These facts include, among others: (a) Acknowledgment by the Principal (OMI): OMI acknowledged that ACS was acting on its behalf and as its integrated component by: (i) holding ACS out to federal regulators as "Owens & Minor, Inc. dba American Contract Systems, Inc." (¶ 287); (ii) publicly representing its relationship with ACS to customers and the market as a direct and seamless integration into OMI, deliberately omitting the separate intermediary structure (¶ 276); (iii) representing the combined operation to investors as a single fully integrated and vertically-integrated enterprise, using consolidated terms like "we," "our," and "Company" to describe the subsidiary's operations ((¶ 272), (¶ 278), (¶ 292)); (iv) issuing "URGENT: MEDICAL DEVICE FIELD CORRECTION" notices directly as "Owens & Minor" and serving as the public point of contact, thereby acknowledging its role as the principal responsible for the agent's

_____

Act, to the extent that facts bear out that the transaction was structured to improperly shield OMI from known EtO-related tort liabilities, as OMI has repeatedly acknowledged in the corporate filings.

products (¶ 289);  (v) acknowledging the financial risks of the EtO sterilization operations as a direct risk to OMI itself in SEC filings to its own investors (¶ 279); and (vi) projecting its corporate identity into the EtO Facility by supplying a poster celebrating OMI's 140th anniversary and requiring it to be displayed on the facility's wall (¶ 285). (b) Acceptance by the Agent (ACS): ACS accepted its role as OMI's agent by: (i) complying with OMI's enterprise-wide branding, direction, and operational directives, including product recalls (¶ 289); (ii) accepting the integration of its own ACS executive, Charlie Persby, into the OMI corporate structure, whereby Mr. Persby publicly identifies his primary role as "VP, Corporate Accounts" for Owens & Minor (¶ 283); and (iii) functioning in a dependent manner upon OMI's provision of essential day-to-day adjuncts and shared services, including HR, regulatory direction, IT, and legal support (¶ 288). (c) Control by the Principal (OMI): OMI exercised "high and very significant" and granular control over the daily operations giving rise to this lawsuit, including: (i) staffing the EtO Facility with its own employees in key management and compliance roles, including the Plant Manager and the Director of Sterilization, who identify as OMI employees (¶ 281); (ii) directing all essential central services necessary for daily operations, including human resource management, regulatory direction, information technology, emission control technology, and legal support (¶ 288); (iii) exercising direct command over regulatory compliance by having OMI directors communicate with the FDA regarding the EtO Facility (¶ 280), (¶ 287)); (iv) treating the ACS General Manager as a divisional manager (an OMI VP) integrated directly into OMI's management structure (¶ 283); and (v) exercising ultimate operational control over product safety by initiating and managing enterprise-wide recalls (¶ 289).

302.    Accordingly, from December 16, 2021, ACS acted as OMI's actual agent in conducting its EtO sterilization operations at issue in this Complaint.   Because ACS was acting

as OMI's agent and within the course and scope of that agency during this period, OMI, as the principal, is vicariously liable for the tortious conduct of its agent, ACS, as alleged in this Complaint occurring from that date forward.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests this Court enter judgment against Defendant, **OWENS & MINOR, INC.,** for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XXI
### (Claim Against OMI and O&M Halyard for Parental Liability Based on Alter Ego and Piercing the Corporate Veil)

303.    Estate Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297 and incorporates them herein as if fully set forth.

304.    Under Florida law, the corporate veil may be pierced where a parent so dominates and controls a subsidiary that the subsidiary is a "mere instrumentality," and the corporate form is used to mislead creditors, perpetrate a fraud, or work an injustice. See Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114 (Fla. 1984). This standard applies when an ultimate parent uses its dominant control over one subsidiary (an intermediary) to facilitate a fraudulent scheme or insulate the parent from the known liabilities of another operating subsidiary, thereby using the entire structure as a "corporate fiction" or "sham to accomplish some ulterior purpose." See Steinhardt v. Banks, 511 So. 2d 336 (Fla. 4th DCA 1987).

305.     OMI and O&M Halyard satisfy both prongs of the Dania Jai-Alai test, demonstrating both complete domination of ACS as a "mere instrumentality" and the use of that corporate structure to perpetrate a fraud and a manifest injustice.

76

306.    Domination (Alter Ego): OMI and O&M Halyard, and ACS, functioned as a single instrumentality dominated by OMI. OMI dominates O&M Halyard, and the proof of this domination is that O&M Halyard manifested no separate corporate interests of its own regarding its own subsidiary, ACS. Instead, O&M Halyard, acting in the role of a stooge, allowed OMI (the grandparent) to cause it to acquire ACS in the first instance and allowed OMI to completely bypass it and exercise direct, operational control over ACS (the grandchild). This direct OMI-to-ACS control is, upon information and belief, established by: (a) OMI staffing ACS facilities with employees identifying as OMI employees (¶ 281); (b) OMI providing core business services including human resources, information technology, legal services, and emissions technology (¶ 288); (c) Charlie Persby identifying as an OMI VP (not an O&M Halyard VP) (¶ 283); (d) OMI handling key FDA regulatory compliance for ACS directly as OMI d/b/a ACS (¶ 280), (¶ 287)); (e) OMI exercising direct command over product safety and market activity by initiating and managing enterprise-wide product recalls as "Owens & Minor" and serving as the direct customer point of contact (¶ 289); (f) OMI consistently disregarding all corporate separateness in its public-facing identity, representing the entire operation to investors, customers, and employees as a single, "fully integrated" enterprise ((¶ 272), (¶ 278)), using consolidated SEC language like "we" and "our" (¶ 292), claiming Florida distribution centers as its own (¶ 291), and completely omitting O&M Halyard from its public narrative of the acquisition (¶ 276); (g) OMI further disregarded corporate separateness by distributing and requiring display of corporate anniversary materials, including a poster celebrating OMI's 140th anniversary, at the EtO Facility. Such directives demonstrate OMI's treatment of the facility as its own operation (¶ 285).

307.    Improper Conduct (Fraud and Injustice): OMI used its total domination over its subsidiaries, including O&M Halyard, to perpetrate a fraud and cause manifest injustice. This

77

improper conduct, upon information and belief, includes: (a) Fraudulent Use of O&M Halyard as a Stooge/Intermediary: The central improper conduct is the fraudulent structuring of the ACS acquisition. Knowing ACS possessed massive foreseeable tort liabilities (¶ 279), OMI used its dominant control over its otherwise legitimate subsidiary, O&M Halyard, to force it to act as a "convenient stooge." O&M Halyard was used not for a legitimate business synergy, but as a "pretext" and "legal structure designed to create a layer of corporate distance" (¶ 275), a shield to absorb the ACS liability and insulate the ultimate parent, OMI. (b) the Bifurcated Strategy Fraud: OMI and O&M Halyard participated in a fraudulent bifurcated strategy (¶ 286). OMI publicly claimed ACS as its own direct, vertically-integrated division to customers and investors ((¶ 272), (¶ 276), (¶ 278), (¶ 287)), while simultaneously relying on O&M Halyard's corporate form (the stooge) to legally distance itself from ACS's known environmental torts. (c) Strategic Undercapitalization and Fund Depletion: OMI used its control over the entire structure to utilize ACS as a pledge to collateralize its own corporate obligations and ambitions, while upon information and belief, depleting ACS's cash assets and sweeping its revenues into OMI controlled financial vehicles (¶ 293), leaving ACS inadequately capitalized to satisfy known liabilities OMI has worked to avoid incurring itself. This use of a parent-controlled structure to deplete funds and strand creditors is a paradigmatic improper purpose. (d) Concealment and Consciousness of Guilt: OMI engaged in concealment by scrubbing its corporate website of admissions that ACS was "fully integrated," demonstrating guilty knowledge that its public claims (which bypassed O&M Halyard) were true and legally damaging (¶ 294). (e) Strategic Divestiture to Evade Known Liabilities: Upon information and belief, OMI is finalizing the scheme by divesting the entire segment including ACS and O&M Halyard (¶ 295). OMI's own $755.5 million write-down (¶

296) is a financial admission of these massive liabilities. Using O&M Halyard as a tool to absorb and then dump these known liabilities constitutes a manifest injustice (¶ 297).

308.     This pattern of domination and improper conduct designed to strand known tort victims, satisfies the <u>Dania Jai-Alai</u> test. Equity should not permit this conduct. Accordingly, the corporate veils of both ACS and O&M Halyard should be pierced, with OMI and O&M Halyard being held jointly and severally liable as the alter egos of ACS for the tortious conduct of ACS as alleged in this Complaint.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests that this Court enter judgment against OMI and O&M Halyard holding them jointly and severally liable with ACS for all compensatory damages, together with interest, costs, and such further relief as this Court deems just and proper.

**PART 5**
**BATTERY CLAIMS**

**Allegations Common to Battery Claims**

309.     ACS, as alleged more fully above, operated its facility using an uncontrolled emissions process (the "gas-in-bag" method) that utilized EtO, a known human carcinogen, mutagen, and genotoxic gas.

310.     EtO, once released into the ambient air, is a physical, tangible substance. It is readily inhaled by individuals within the zone of risk, absorbed through the lungs, and distributed throughout the bloodstream and body tissues. This inhalation constitutes a physical contact with the Estate Plaintiff's person.

311.     This EtO contact with Estate Plaintiff was inherently harmful and offensive. It was harmful because EtO is a toxic agent that chemically attacks and damages human DNA; it was

79

offensive because this carcinogenic substance was introduced into Estate Plaintiff's body without Estate Plaintiff's knowledge or consent, in violation of personal dignity and bodily integrity.

312.    Estate Plaintiff did not consent to the physical contact caused by ACS's emissions of EtO, nor was such contact legally justified or privileged.

313.    As a proximate and substantial result of this repeated and chronic physical touching (the "Battery"), EtO entered Estate Plaintiff's bloodstream, causing chronic cellular exposure and damage to Estate Plaintiff's DNA. This damaged DNA replicated within Estate Plaintiff's body and was a proximate and substantial cause of Estate Plaintiff's Decedent's cancer and death.

314.    As a result thereof: (a) Surviving Spouse has suffered damages including the loss of Estate Plaintiff's Decedent's companionship and protection; mental pain and suffering; the value of lost support and services from the date of Estate Plaintiff's Decedent's injury to the date of death, with interest; and the future loss of support and services from the date of death, reduced to present value; and (b) the Estate has sustained damages including all medical and funeral expenses paid by or on behalf of Estate Plaintiff's Decedent or which have become a charge against the Estate; the loss of the Estate Plaintiff's Decedent's earnings from the date of injury to the date of death; and the loss of prospective net accumulations which the Estate might reasonably have been expected to acquire had the Estate Plaintiff's Decedent survived, reduced to present value.

## COUNT XXII
### (Claim Against ACS for Battery)

315.    Estate Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 309 to 314 and incorporates them herein as if fully set forth.

316.    ACS acted with the intent to engage in the conduct that resulted in the Battery. This intentional conduct included the intentional operation of sterilization chambers, the

80

intentional venting of EtO, and the intentional design and operation of its facility (using an uncontrolled method and short stack) that caused the emissions.

317.    As more specifically alleged above (including in the General Allegations and Claim Against ACS for Trespass count), ACS knew with substantial certainty that intentionally performing these acts in a densely populated area would cause EtO to physically contact (be inhaled by) and invade the bodies of individuals in the surrounding community, including Estate Plaintiff.

318.    ACS's intentional acts, performed with knowledge of substantial certainty that contact would occur, resulted in the unconsented, harmful, and offensive contact, which proximately and substantially caused Estate Plaintiff's Decedent's cancer and death, as alleged in the Common Battery Allegations.

319.    ACS is therefore directly liable for the Battery and all resulting damages.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XXIII
### (Claim Against LeeSar, OMI and O&M Halyard
### for Civil Conspiracy to Commit Battery)

320.    Estate Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297, and paragraphs 309 to 537 and incorporates them herein as if fully set forth.

81

321.    This claim is derivative of the Claim for Battery set forth in the immediate preceding count against ACS. ACS is liable on account of such claim for damages to Estate Plaintiff.

322.    LeeSar, OMI, O&M Halyard, and ACS were members to an agreement and conspiracy to commit such Battery.

323.    As to O&M Halyard, the conspiratorial agreement was predicated on its distinct personal stake, which was adverse to the unified interests of the OMI enterprise. The scheme was structured to function as a symbiotic, fraudulent firewall. O&M Halyard's corporate form served to insulate OMI from enterprise liability, a goal consistent with a unified corporate interest. Simultaneously, however, OMI's direct operational bypass of O&M Halyard to control ACS served to insulate O&M Halyard from direct operational culpability for the tortious conduct. O&M Halyard's personal stake arose from the latter. As an established entity with a distinct legal persona and valuable historical goodwill predating the acquisition, Halyard's acquiescence to this fraudulent bypass was bargained for in exchange for a benefit unique to itself: the preservation of its own corporate identity from the direct reputational and legal contamination that would arise from managing ACS's operations. While OMI's motive was the protection of the conglomerate, O&M Halyard's motive was the protection of its own unique identity from the conglomerate's other actors. This self-preservationist motive, to avoid direct culpability by serving as a willing stooge in the bypass, is fundamentally separate from and adverse to its ordinary role as a subsidiary.

324.    This conspiracy transpired over two periods.

325.    The first period was the Initial Conspiracy dating from approximately 2010 to December 21, 2021. The conspirators ACS (acting through its key management, including

82

Fleischhacker) and LeeSar (acting as the on-site operational partner directing throughput from its co-located space) formed the initial agreement.

326.    The second period was the Continuing Conspiracy dating from approximately December 21, 2021, to the present. During this period OMI, through its subsidiary O&M Halyard, acquired ACS and joined the ongoing conspiracy.

327.    This conspiracy was executed through a continuous agreement that grew over time which shared the unlawful objective of committing a battery against Estate Plaintiff and the community for financial gain.  Initially, during the first period, the co-conspirators were Defendants ACS and LeeSar. They formed an agreement to profit from the high-throughput sterilization of medical devices using an uncontrolled emissions method that they knew was substantially certain to result in harmful and offensive contact with residents, including Estate Plaintiff. Subsequently, during the second period, a new and broader agreement was formed among Defendants OMI, O&M Halyard, ACS, and LeeSar, which incorporated the objective of the first, to continue the battery against the community for profit, but added a fraudulent purpose: to use the newly implemented parent-subsidiary structure to insulate the ultimate parent, OMI, from the massive and foreseeable tort liabilities generated by the operation. As part of this expanded agreement, OMI and O&M Halyard did not merely continue the prior operation; they actively conspired to create and maintain a fraudulent corporate shield, with O&M Halyard agreeing to serve as the stooge intermediary, thereby furthering the battery while attempting to ensure the primary beneficiary would evade responsibility.

328.    Overt acts were committed by all co-conspirators in furtherance of this continuous agreement.

83

329.    ACS: (Pre- and Post-Acquisition) Committed the daily overt act of intentionally venting hazardous EtO via the uncontrolled "gas-in-bag" method, utilizing a short stack resulting in ground-level fumigation, all under the continuous oversight of its Director of Sterilization.

330.    LeeSar: (Pre- and Post-Acquisition) Committed the overt acts of scheduling the throughput, directing sterilization orders from its co-located space, and actively aiding and abetting the continuous battery performed by both the original and successor operators (ACS and OMI).

331.    OMI: (Post-Acquisition) Joined and furthered the conspiracy by committing overt acts of direct command, including: (a) retaining ACS's key technical management (Fleischhacker) to continue the sterilization operations; (b) directing the facility's "regulatory direction" and "emission control technology"; and (c) identifying itself to the FDA as the actual operator ("dba American Contract Systems, Inc.").

332.    O&M Halyard: (At Acquisition) Committed the overt act of agreeing to serve as the fraudulent passive stooge/intermediary designed solely to create a layer of corporate distance and insulate OMI, the conspiracy's primary beneficiary, from liability.

333.    All co-conspirators knew, given the extensive history of EtO's hazards, the uncontrolled method, and the EtO Facility's location, that their agreed-upon plan was substantially certain to result in a battery against the surrounding residents, which includes Estate Plaintiff.

334.    As a proximate and substantial result of these acts done in furtherance of the ongoing conspiracy, Estate Plaintiff was subjected to the Battery (chronic exposure), which proximately and substantially caused Estate Plaintiff's Decedent's diagnosed cancer and death.

335.    As co-conspirators, LeeSar, OMI, and O&M Halyard are jointly and severally liable for all damages resulting from the Battery committed by ACS in furtherance of their agreement.

**WHEREFORE**, Estate Plaintiff, for the benefit of Surviving Spouse and the Estate, respectfully requests judgment holding Defendants, **LEESAR, INC**., **OWENS & MINOR, INC**., and **O&M HALYARD, INC**., jointly and severally liable for the compensatory damages alleged in the Common Battery Allegations, together with interest, costs, attorneys' fees, and all relief as this Court deems just and proper.

## *SECTION B: CLAIMS OF THE INDIVIDUAL PLAINTIFF*

### INDIVIDUAL PLAINTIFF PART 1
### STRICT LIABILITY CLAIMS

### COUNT XXV
### (Individual Plaintiff Claim Against ACS for Strict Liability for Ultrahazardous Activity)

336.     Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

337.     Florida adheres to the Restatement (Second) of Torts §§ 519–520, imposing strict liability for activities classified as "abnormally dangerous," which Florida courts describe as "ultrahazardous activities." Bunyak v. Clyde J. Yancey & Sons Dairy, Inc., 438 So.2d 891 (Fla. 2d DCA 1983); Old Island Fumigation, Inc. v. Barbee, 604 So.2d 1246 (Fla. 3d DCA 1992).

338.     Section 519(1) provides: "One who carries on an abnormally dangerous activity is subject to liability for harm … resulting from the activity, although he has exercised the utmost care to prevent the harm."

339.     Section 520 enumerates six factors for courts to weigh in determining whether an activity is ultrahazardous: (a) high degree of risk; (b) likelihood of great harm; (c) inability to eliminate risk by reasonable care; (d) uncommon usage; (e) inappropriateness of the activity to the

85

place; and (f) whether the activity's value to the community is outweighed by its dangerous attributes.

340.    Noxious gases and toxic releases into populated areas are paradigmatically ultrahazardous activities. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 78, at 549–50 (5th ed. 1984) ("noxious gases in the midst of a town").

341.    An application of Restatement factors to the underlying case demonstrates that the carrying on of medical sterilization utilizing EtO is an ultrahazardous activity for which strict liability should be imposed.

342.    The activity, as alleged herein, creates a high degree of risk of great harm that cannot be eliminated by reasonable care, is not a matter of common usage, and is dangerously inappropriate for the populated community where it was conducted.

343.    Medical sterilization using EtO involves a high degree of risk of harm. The process requires introducing EtO, a volatile, mutagenic, and carcinogenic gas, into permeable polyethylene bags. By its nature, EtO disperses at community exposure levels. The process creates a persistent carcinogenic plume over surrounding neighborhoods, placing thousands of nearby residents at constant risk of inhalation exposure. This is the type of "special danger to others" contemplated by Restatement § 520(a).

344.    There is a likelihood of great harm inherent in medical sterilization using EtO. The harm EtO causes is not limited to irritation or temporary illness but includes irreversible DNA alkylation, chromosomal aberrations, and cancer. As Florida courts recognized in Old Island Fumigation, an activity that "necessarily involves a risk of serious harm" suffices to trigger strict liability even if only some exposed individuals sustain injury. The seriousness of potential harm here, life-altering or fatal malignancies, places EtO sterilization squarely within this category.

86

345.    Given current technology, medical sterilizers are unable, through the use of reasonable care, to prevent a level of emissions that create dangerous concentration of EtO in the neighboring community. Even with the belated installation of scrubbers in 2023, the EtO concentrations will remain hazardous from the remaining stack and fugitive emissions which inure to the process. That fact demonstrates that, by definition, the danger cannot be eliminated through due care. This echoes the reasoning in <u>Old Island Fumigation</u>, where despite precautions, fumigant gas escaped through hidden defects, proving the risk could not be eliminated. EtO sterilization is comparable: despite controls, fugitive and stack emissions persist, leaving residents involuntarily exposed.

346.    Medical sterilization is a highly specialized activity which is not a matter of common usage. Florida courts, by adopting the Restatement factors, recognize the importance of this element.  <u>See</u> <u>Hutchinson v. Capeletti Bros.</u>, 397 So.2d 952 (Fla. 4th DCA 1981). The official commentary defines "common usage" as an activity "customarily carried on by the great mass of mankind... such as driving automobiles." By contrast, activities conducted by only a "small number of operators" or "comparatively small number of persons," such as blasting or handling explosives, are not common usage. EtO sterilization is a narrow, specialized practice not performed by the public, hospitals, or ordinary businesses. It is confined to fewer than one hundred specialized facilities nationwide. This rare, specialized use is akin to fumigation and blasting, placing it squarely outside of common usage.

347.    EtO sterilization is particularly ill-suited to a facility situated in the heart of a residential community. The surrounding area contained schools, churches, playgrounds, and homes. Location matters. An activity may be acceptable in an isolated industrial zone but

ultrahazardous when carried out amidst neighborhoods. Here, the emission of a known carcinogen into a densely populated area epitomizes inappropriateness of location.

348.    The Restatement commentary makes clear that the factor of balancing value to the community against danger concerns local utility of the activity as conducted in that place, not the abstract societal value of the industry. See Restatement (Second) § 520, cmt. k. While sterile medical devices are important to healthcare generally, the EtO Facility's operation provided no unique local benefit. The surrounding community has not and does not depend economically on the EtO Facility, nor do residents receive any offsetting advantage. Instead, the risk of cancer and genetic harm fall entirely on them. Where community value is diffuse and generalized, but danger is concentrated and unavoidable, strict liability is warranted. Even useful but dangerous activities must "pay their own way." Strict liability serves this exact purpose. It ensures that the inevitable costs of an ultrahazardous activity are not forcibly shifted onto the "unlucky few" members of the community who happen to live nearby, but are instead properly borne by the enterprise conducting the activity which is better placed to allocate the burden across society.

349.    All six § 520 factors weigh decisively in favor of classifying EtO sterilization as an ultrahazardous activity under Florida law.

350.    Individual Plaintiff was exposed to EtO emissions, sustained DNA injury, and developed cancer and related health effects as a direct and proximate result of Defendants' ultrahazardous activity.

351.    Accordingly, Defendants are strictly liable to Individual Plaintiff for all damages proximately caused by their operation of the EtO Facility, regardless of any care exercised.

352.    As more fully alleged above, the chronic exposure to EtO from the EtO Facility was a substantial cause of Individual Plaintiff's cancer, and, as a result of such cancer, Individual

88

Plaintiff suffered bodily injury; resulting pain;   suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

### COUNT XXVI
**(Individual Plaintiff Claim Against LeeSar for Vicarious Liability
Pursuant to Restatement of the Law, Torts, Section 427A)**

353.     Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 75 through 83 and incorporates them herein as if fully set forth.

354.     At all relevant times, Defendant LeeSar engaged Defendant ACS to perform EtO sterilization on LeeSar-owned equipment and LeeSar-specified Custom Packs at the EtO Facility.

355.     The EtO sterilization conducted for LeeSar's benefit at this location constitutes an abnormally dangerous and ultrahazardous activity.

356.     The Restatement (Second) of Torts § 427A provides: "One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity."

357.     By engaging ACS to perform the ultrahazardous activity of utilizing EtO to sterilize Custom Packs, LeeSar remains liable for harm caused to any third parties as a result of that activity.

358.     The damages suffered by Individual Plaintiff were proximately caused by the ultrahazardous activity carried out for LeeSar's benefit. Accordingly, LeeSar is strictly liable to Individual Plaintiff for all resulting damages, regardless of fault.

359.     As more fully alleged above, the chronic exposure to EtO from the Eto Facility was a substantial cause of Individual Plaintiff's cancer, and, as a result of such cancer, Individual Plaintiff suffered bodily injury; resulting pain; suffering; disability; disfigurement; mental anguish, including the fear of remission of such cancer; loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff requests judgment against Defendant, **LEESAR, INC.,** for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

## PART 2

## NUISANCE AND TRESPASS CLAIMS

### COUNT XXVII
### (Individual Plaintiff Claim Against ACS for Private Nuisance)

360.    Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

361.    At all relevant times, Individual Plaintiff resided in the Exposure Zone at such distance from the EtO Facility as alleged above. Individual Plaintiff, as a resident, held a possessory interest in this property.

362.    ACS, through its sterilization operations, has emitted large quantities of EtO, a toxic and carcinogenic gas, into the surrounding community, as more specifically alleged above.

363.    ACS's conduct was intentional, as it knew its operations released EtO, was aware of the gas's toxic and carcinogenic properties, as more specifically alleged above, and knew with substantial certainty that these emissions would invade the property of nearby residents, including Individual Plaintiff.

364.    EtO emitted from Defendants' facility, including both stack emissions and fugitive emissions, traveled beyond Defendants' property boundaries and invaded Individual Plaintiff's residence and neighborhood environment, including the Exposure Zone, contaminating the air in and around Individual Plaintiff's home(s), yard(s), and immediate neighborhood.

365.    The intrusion of EtO constituted a continuous, involuntary, and unavoidable exposure that materially and substantially interfered with Individual Plaintiff's private use and enjoyment of Individual Plaintiff's property.

366.    The interference was substantial and resulted in actual, material, physical discomfort, causing Individual Plaintiff: (a) physical discomfort, distress, and disruption of daily life; (b) loss of peace of mind and fear of long-term harm; and (c) exposure to serious and permanent health risks, including cancer.

367.    The interference was unreasonable, as: (a) the EtO Facility is situated in or near residential neighborhoods, schools, and businesses, as more specifically alleged above; (b) families and children, including Individual Plaintiff, should not be subjected to carcinogenic gas intruding upon their homes; (c) the harm caused to Individual Plaintiff far outweighed any benefit to the local community; and (d) safer alternatives and emission controls were available to ACS, as more alleged below.

368.    This substantial and unreasonable interference with Individual Plaintiff's use and enjoyment of their property proximately and substantially caused Individual Plaintiff's chronic exposure to EtO at Individual Plaintiff's residence, which created serious risks of bodily injury and disease.

369.    Florida law recognizes nuisance claims even where the defendant's operations are otherwise lawful, provided they unreasonably interfere with neighbors' use and enjoyment of property.

370.    As a proximate and substantial result of ACS's private nuisance, Individual Plaintiff suffered serious and permanent health injuries. These injuries, including Individual Plaintiff's diagnosed cancer, were proximately and substantially caused by the chronic exposure

92

to EtO at Individual Plaintiff's residence, resulting in damages including: bodily injury; resulting

pain; suffering; disability; disfigurement; mental anguish, including the fear of remission of

such cancer; loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting

conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services

(including without limitation oral and intravenous medication), oncological care (including

without limitation chemotherapy and/or radiation therapy or such oncological treatment and

therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses

related to such care and treatment; various temporary and/or permanent modifications to their

home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or

continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses

suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's

life.

371.    The harm was avoidable, as safer alternatives and effective emission controls, such

as dry-bed scrubbers and catalytic oxidizers, were commercially available and customary in the

industry, yet ACS failed to install or properly utilize this technology for over a decade.

**WHEREFORE**, Individual Plaintiff requests judgment against Defendant, **AMERICAN

CONTRACT SYSTEMS, INC.**, for damages in a sum within the jurisdictional limits of this

Court, together with costs of suit, and such further relief as the Court deems proper, including,

without limitation, allowable prejudgment and post-judgment interest.

### COUNT XXVIII
### (Individual Plaintiff Claim against ACS for Public Nuisance)

372.    Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates

them herein as if fully set forth.

373.    As more particularly alleged above, the sterilization process employed by ACS relies on EtO, a noxious, mutagenic, and carcinogenic gas. As more particularly alleged above, this method produced over the years large-scale hazardous emissions that migrated into and about the surrounding community.

374.    In fact, the EtO Facility emitted far more EtO into the nearby community than a similarly situated sterilizer would have had it utilized a traditional method involving far more EtO (but which EtO was scrubbed consistent with regulatory emission controls and/or abated by applicable regulations with regard to installation of emission controls).

375.    As alleged more particularly above, the EtO Facility's emissions, including stack and fugitive emissions, at all times material, even after installation of emission control devices in 2023, created a chronic plume of EtO that migrated to and over the populated communities near the EtO Facility, landing on residences, cars, clothing, and furniture, thereby constituting an invasion of possessory rights. (The Exposure Zone was within such area.)

376.    The EtO Facility's release of EtO directly into the community was at all times material knowing and intentional.

377.    Given the growing scientific and regulatory awareness of EtO's dangers, as more specifically alleged above, ACS, as a medical sterilizer whose business necessitated the use of EtO, knew the hazards of the quantities it was emitting.

378.    By discharging EtO into the community, ACS unreasonably interfered with rights held in common by the public, including the right to breathe clean air, to be free from involuntary exposure to noxious gas, and to live and recreate in a safe and healthy environment.

379.    The interference caused by ACS's conduct was substantial, continuous, and indiscriminate, impacting a broad cross-section of the public such as residents, schoolchildren, local workers, and community visitors.

380.    ACS created and maintained conditions that endangered the health, comfort, and safety of the public and endangered the public health and safety of the neighborhood at large by releasing noxious carcinogenic emissions into areas where families live, children attend school, and the community carries on daily life.

381.    ACS's emissions of EtO into the Fort Myers community constitute a condition injurious to health, safety, and comfort of the general public.

382.    ACS's emissions additionally constitute a statutory nuisance under Florida law. Florida Statute §386.041 defines the release of gases that are "injurious to... human life" as a public nuisance injurious to health. The release of EtO, a known human carcinogen and genotoxic gas, as alleged above, falls squarely within this statutory definition and constitutes prima facie evidence of a public nuisance

383.    By emitting EtO for more than a decade without emission controls, ACS created an ongoing public health hazard, unreasonably endangering the community, which continues to this day notwithstanding the installation of emission control devices.

384.    Florida recognizes public nuisance claims where emissions affect the health of the broader community.

385.    The interference with public rights caused by ACS's conduct is not speculative or trivial, rather it is real, material, and substantial and has persisted for more than a decade.

386.    ACS's emissions have generated widespread disruption and fear, including: (a) residents altering daily routines to avoid outdoor exposures; (2) residents losing peace of mind due

95

to elevated cancer risks; and (3) residents' impairment of the use and enjoyment of their homes and nearby public spaces.

387.    ACS's conduct is unreasonable because: (a) the EtO Facility is located within or adjacent to a well populated residential areas, schools, day care centers, businesses, homes, and places of worship, as more specifically alleged above, and this siting made the nuisance not hypothetical but inevitable; (b)  the harms imposed on the public, including increased cancer risks and genetic damage, are grave and irreversible, as more specifically alleged above;  (c) the community derives no unique or localized benefit from ACS's operations, while bearing the concentrated risks of its emissions.

388.    Individual Plaintiff, in addition to these community-wide harms, has suffered special injuries distinct from the public at large. Specifically, Individual Plaintiff contracted cancer. The cancer was proximately and substantially caused by the nuisance, from the chronic exposure of the Individual Plaintiff to EtO within the Exposure Zone during the Period of Exposure. The cancer constituted a serious and permanent health injury, as alleged above. Accordingly, Individual Plaintiff has sustained special damages distinct from the general public, including: (a) bodily injury, including the cancer; resulting pain;      suffering; disability; disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of

96

these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life; and (b) emotional distress beyond that of the general community.

389.    Because Individual Plaintiff's damages are distinct and personal, Individual Plaintiff has standing to assert a public nuisance claim.

390.    ACS's continued operation of the EtO Facility constitutes a wrong to the community as a whole, threatening the health and safety of countless individuals and degrading the livability of the surrounding area.

**WHEREFORE**, Individual Plaintiff requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

## COUNT XXIX
### (Individual Plaintiff Claim Against ACS for Trespass)

391.    Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

392.    At all relevant times, Individual Plaintiff owned or was in lawful possession of the real property as alleged more fully above ("Property"), as more specifically alleged above.

393.    ACS knowingly and intentionally emitted hazardous levels of EtO into the surrounding community and onto Individual Plaintiff's Property.

394.    In light of the extensive, decades-long history of scientific and regulatory warnings about EtO's hazards, as alleged above, ACS, a medical sterilizer whose business relied on EtO, knew the dangers of the quantities it was emitting into the neighboring community.

395.    As more particularly alleged above, ACS was aware of the carcinogenic dangers associated with EtO for decades and knew with substantial certainty that its emissions were reaching the surrounding community at dangerous levels and would physically enter Individual Plaintiff's Property.

396.    Notwithstanding this knowledge, ACS intentionally set in motion the events that caused EtO to enter and trespass upon Individual Plaintiff's Property by designing and operating its facility in a manner that it knew would, with substantial certainty, cause stack emissions and fugitive emissions to be released from the building and invade Individual Plaintiff's Property.

397.    The siting of the EtO Facility near a densely populated residential area, as more specifically alleged above, made the physical invasion of Individual Plaintiff's Property by these hazardous emissions not merely foreseeable, but inevitable.

398.    EtO is a tangible, physical substance. As a proximate result of ACS's intentional acts, EtO gas and/or particulates physically invaded Individual Plaintiff's Property, landing on and contaminating the soil, the structure of the home, furniture, and other surfaces, and permeating the air within the Property's boundaries.

399.    Further, because of EtO's molecular weight, it can collect, or accumulate, around ground level. When there are calm meteorological conditions, temperature inversions can occur, allowing EtO emitted from the EtO Emitting Facility to become trapped and "hover" near the ground, causing a more concentrated physical invasion of Individual Plaintiff's Property.

98

400.    ACS was not authorized to cause EtO to enter and remain on Individual Plaintiff's Property.

401.    ACS did not possess any actual or implied permission from Individual Plaintiff to cause EtO to enter Individual Plaintiff's Property.

402.    While ACS may have possessed permits to produce EtO, it did not possess any permit, privilege, or authorization to emit unsafe levels of EtO, to emit unreported fugitive emissions, or to otherwise cause EtO to invade and contaminate Individual Plaintiff's Property in a dangerous, unlawful, and/or harmful manner.

403.    As a proximate and substantial result of ACS's trespass, Individual Plaintiff was chronically exposed to EtO at Individual Plaintiff's Property. This exposure, as alleged above, proximately and substantially caused Individual Plaintiff's serious and permanent health injuries, including diagnosed cancer.

404.    As a proximate and substantial result of the trespass, Individual Plaintiff sustained damages including: bodily injury; resulting pain;   suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for

99

the remainder of Individual Plaintiff's life. In addition, Individual Plaintiff is entitled to damages for the diminution in property value and/or loss of use of the Property caused by the physical invasion and contamination.

**WHEREFORE**, Individual Plaintiff respectfully requests this Court enter judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT XXX
**(Individual Plaintiff Claim Against LeeSar for Vicarious Liability Pursuant to Restatement of the Law, Torts, Section 427B)**

405.    Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

406.    At all relevant times, LeeSar engaged ACS as an independent contractor to sterilize Custom Packs and other medical devices on LeeSar's behalf.

407.    As more particularly alleged above, the sterilization process employed by ACS relied on EtO, a noxious, mutagenic, and carcinogenic gas. As more particularly alleged above, this method produced over the years large-scale hazardous emissions into the surrounding community. In fact, it emitted far more EtO into the nearby community than a similarly situated sterilizer would have had it utilized a traditional method involving far more EtO, but which EtO was scrubbed consistent with regulatory emission controls.

408.    Restatement (Second) of Torts § 427B provides: "One who employs an independent contractor to do work which the employer knows or has reason to know to be likely

to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance."

409.     In light of the extensive, decades-long history of scientific and regulatory warnings about EtO's hazards, LeeSar, as a medical distributor with a custom packed tray line of business necessitating the use of EtO, combined with the gas-in-bag method utilized by ACS (which, as alleged above, until quite recently emitted virtually all of the EtO utilized in the process into the local community, and which still spews sufficient stack and fugitive emissions to create a chronic elevated and hazardous levels of EtO as more particularly described above), it was clear at all times material, including the outset of the engagement, that hiring and retaining ACS to carry out EtO sterilization in the densely populated community surrounding the EtO Facility (including the Exposure Zone) would likely result in the commission of both a public and private nuisance and trespass to local residents, including Individual Plaintiff.

410.     As alleged more particularly above, ACS's emissions, including stack and fugitive emissions, at all times material, created a chronic plume of EtO that migrated onto Individual Plaintiff's Property, landing on the homes, cars, clothing, furniture, constituting an invasion of possessory rights for which ACS is liable in trespass to Individual Plaintiff as alleged herein above.

411.     The continuous exposure of Individual Plaintiff to the noxious gas constituted, as to Individual Plaintiff, an unreasonable interference with the use and enjoyment of land (a private nuisance) and endangered the public health and safety of the neighborhood at large (a public nuisance) for which ACS is liable in nuisance to Individual Plaintiff as alleged herein above.  The siting of the facility amidst schools, homes, and places of worship made the nuisance and trespass not hypothetical but inevitable.

412.    Pursuant to § 427B, LeeSar's liability does not depend on whether it directly operated the sterilizers or dictated ACS's technical emissions practices. The critical fact is that LeeSar hired ACS to engage in work it knew, or should have known, would predictably result in the creation of a nuisance and/or trespass.

413.    Individual Plaintiff's injuries from chronic EtO inhalation resulting from both nuisance and trespass, as alleged above, was a substantial cause of Individual Plaintiff's cancer.

414.    Accordingly, LeeSar is strictly liable for all damages proximately caused resulting from the nuisance and trespass created by ACS's sterilization activities, regardless of fault or delegation, including the following: Individual Plaintiff's bodily injury, including the cancer; resulting pain;   suffering; disability;   disfigurement;   mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;   hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **LEESAR, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

**PART 3**
**NEGLIGENCE AND NEGLIGENCE RELATED CLAIMS**

*Allegations Common to Negligence Claims Set Forth in Section A, Part 3*
*Are Incorporated Within These Counts and Accordingly Are Not Repeated Here*

**COUNT XXXI**
**(Individual Plaintiff Claim Against ACS for Negligence Per Se)**

415.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

416.    At all relevant times, Fla. Stat. §403.161 prohibited ACS from violating or failing to comply with any rule, regulation, or permit issued by the FDEP. At all relevant times, ACS was subject to the NESHAP regulation, 40 C.F.R. §63.362(c) (Subpart O), which was adopted and enforced by the FDEP and mandated 99% emission controls on a chamber utilized for a single-chamber combined sterilization/aeration process at a facility using 1 ton or more of EtO annually. ACS's Air General Permit (AGP) required adherence to all applicable regulations, including Subpart O. As alleged in detail above, ACS knowingly, intentionally, and continuously violated these regulations and its permit. ACS's EtO usage surpassed the 1-ton NESHAP trigger in 2013. ACS admitted actual knowledge of this fact in Fleischhacker's 2014 letter to the FDEP. Despite knowing the 1-ton mandate applied, ACS failed to install the federally mandated 99% effective emission control technology for approximately a decade (2013–July 2023). This failure was a direct violation of §63.362(c) and, consequently, a violation of Fla. Stat. §403.161. ACS concealed this ongoing violation by fraudulently mischaracterizing the nature of its single-chamber combined sterilization/aeration process which were subject to the 1-ton mandate as a bifurcated process involving separate aeration rooms which are subject only to a 10-ton mandate.

417.    These federal and state air pollution regulations were specifically designed to protect the health, safety, and welfare of the public, including residents living in close proximity

103

to hazardous air pollutant sources, from involuntary toxic exposure. Because the Exposure Area suffered from hazardous concentrations of EtO emitted from the EtO Facility as more particularly alleged above, Individual Plaintiff is a member of the specific class of persons these regulations were intended to protect.

418.    These regulations were specifically designed to prevent the exact type of harm Individual Plaintiff suffered: serious bodily injury, genetic damage, and cancer resulting from chronic exposure to carcinogenic air pollution (EtO).

419.    ACS's violation of these statutes and regulations constitutes Negligence Per Se. This statutory violation, the decade-long failure to install the 99% controls mandated by law, was the proximate and substantial cause of the massive, uncontrolled, and unabated release of EtO into Individual Plaintiff's neighborhood. This resulting chronic exposure proximately and substantially caused Individual Plaintiff's diagnosed cancer.

420.    This exposure proximately and substantially caused Individual Plaintiff's serious and permanent health injuries, including Individual Plaintiff's diagnosed cancer. As a proximate and substantial result, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain;    suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are

104

permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XXXII
### (Individual Plaintiff Claim Against ACS for General Negligence)

421.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

422.    ACS had a heightened duty to exercise reasonable care in the operation of its EtO Facility to avoid causing foreseeable harm to those in the surrounding community.

423.    As more specifically alleged above, ACS's conduct, namely, the handling, processing, and large-scale emission of EtO, a known human carcinogen, mutagen, and genotoxic gas, foreseeably created a broad "zone of risk" posing a general threat of grave harm to others, including Individual Plaintiff.

424.    This foreseeable zone of risk included the surrounding residential neighborhoods, schools, and businesses where Individual Plaintiff lived and recreated, as more specifically alleged above.

425.    Given that the risk to be perceived was catastrophic (cancer and genetic damage), ACS's duty to undertake precautions to prevent that harm was correspondingly high.

426.    ACS breached this heightened duty of care and failed to exercise reasonable care. At all relevant times, ACS knew or should have known that EtO is a noxious, toxic, poisonous,

105

and highly carcinogenic gas, and that substantial stack and fugitive emissions were being released from the EtO Facility into surrounding neighborhoods, posing a foreseeable risk of grave harm.

427.    As more particularly alleged above, ACS's negligence includes, but is not limited to, a course of conduct which, in summary, constitutes a decade-long failure to comply with the federal emission control mandates, misrepresentation of its process to regulators, the negligent failure to earlier install available and customary abatement technology.

428.    Additionally, ACS's negligence included, but was not limited to, the following acts and/or omissions: (a) locating the EtO facility in a densely populated area surrounded by homes, schools, and businesses; (b) employing an unusually short exhaust stack and discharging EtO at temperatures only marginally above ambient conditions, causing the resulting plume to exhibit limited buoyancy, fail to disperse into the upper atmosphere, and instead remain concentrated at ground level in the surrounding neighborhoods (a "downwash effect"); (c) emitting dangerous, excessive, unnecessary, and/or unsafe volumes of EtO, as more specifically alleged above; (d) failing to install any emission control devices for over a decade, allowing nearly all EtO emissions to escape uncontrolled, despite knowing that scrubbers and catalytic oxidizers were commercially available; (e) failing to adopt, implement, and/or enforce reasonable and sufficient measures to mitigate or reduce EtO emissions to non-harmful levels, such as failing to install dry-bed scrubbers, catalytic oxidizers, and negative-pressure aeration rooms, which were customary in the sterilization industry; (f) failing to adequately track, record, and/or monitor the amounts or levels of EtO emissions, including failing to report and prevent fugitive emissions; (g) failing to adequately, accurately, and thoroughly report the levels of EtO being emitted to regulators; (h) misleading government entities as to the nature and extent of EtO usage, emissions, and venting type at the EtO Facility; (i) failing to obtain the proper permits based on accurate information; (j)

106

concealing from the public the nature and extent of EtO usage and emissions from the EtO Facility;

(k) failing to warn Individual Plaintiff and others in the surrounding community that they were

being exposed to hazardous levels of EtO; (l) failing to advise Individual Plaintiff and others that

they were breathing in EtO and that the EtO Facility was emitting a known carcinogen; (m) failing

to select and utilize safer, alternative methods to sterilize devices at the EtO Facility, or failing to

investigate, study, or test such alternatives; (n) failing to adequately study or test the effects of the

Facility's EtO emissions on community air quality and public health; (o) failing for 13 years from

the opening of the EtO Facility to report to regulators that its sterilization process involved the use

of a "single-chamber combined sterilization/aeration process," which would have required the

installation of emission control devices as early as 2014; (p) negligent training, supervision, and

retention of employees and agents responsible for operating the EtO Facility and controlling EtO

emissions; and (q) placing its own economic interests above the health and well-being of

Individual Plaintiff and the surrounding community by failing to update or upgrade equipment

despite known risks.

    429.    As a proximate and substantial result of ACS's negligent conduct, Individual

Plaintiff was chronically exposed to hazardous levels of EtO in the Exposure Zone. This exposure

proximately and substantially caused Individual Plaintiff's serious and permanent health injuries,

including diagnosed cancer.

    430.    As a proximate and substantial result of ACS's negligence, Individual Plaintiff

sustained damages including: bodily injury, including the cancer; resulting pain;  suffering;

disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of

capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of

ability to earn money;  hospitalization, medical care, pharmacological services (including without

limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

431.     ACS knew or should have known that members of the public, including Individual Plaintiff, were within the foreseeable zone of risk and would foreseeably suffer injury because of ACS's failure to exercise reasonable care.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XXXIII
**(Individual Plaintiff Claim Against LeeSar for Vicarious Liability Pursuant to Restatement of the Law, Torts, Section 427)**

432.     Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

433.     At all relevant times, LeeSar engaged ACS as an independent contractor to sterilize Custom Packs and other medical devices using EtO at the EtO Facility.

434.     Restatement (Second) of Torts § 427 provides: "One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work... is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

435.    Florida courts recognize this principle, holding that a principal has a non-delegable duty when hiring a contractor to perform inherently dangerous work.

436.    The work LeeSar hired ACS to perform, the large-scale sterilization of medical devices using EtO, is an inherently dangerous activity under Florida law.

437.    The activity involves the processing and emission of EtO, a known noxious, mutagenic, and human carcinogenic gas, as more specifically alleged above.

438.    This work poses a "recognizable and substantial danger inherent in the work." As noted by Florida courts referencing legal treatises, the "emission of noxious gases into densely populated areas," which is precisely the work ACS performed for LeeSar in this location, is a classic example of an inherently dangerous activity.

439.    Given the EtO Facility's siting in a dense residential community, this work was such that "in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken."

440.    LeeSar, as a sophisticated medical distributor whose business required EtO sterilization, knew or had reason to know that the work it hired ACS to perform involved these "special dangers" inherent to emitting EtO in a populated area.

441.    As alleged more fully above in the Individual Plaintiff Claim Against ACS for General Negligence, the contractor (ACS) failed to take reasonable precautions against this danger. This failure included, but was not limited to, operating for over a decade without any emission controls, failing to install industry-standard abatement systems like dry-bed scrubbers and catalytic oxidizers, and negligently designing the EtO Facility with a short stack that caused ground-level fumigation.

109

442.    Under § 427, LeeSar's duty as the principal employing ACS was to protect the community from these inherent dangers associated with utilizing EtO to sterilize Custom Packs was non-delegable.

443.    The physical harm and serious bodily injuries suffered by Individual Plaintiff, including Individual Plaintiff's diagnosis with cancer, were proximately and substantially caused by ACS's failure to take reasonable precautions against the special dangers inherent in the work LeeSar hired it to perform as more particularly alleged in paragraphs 175 and 176 above which are hereby incorporated by reference as if set fully forth herein.

444.    As a proximate and substantial result of such failure, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain;    suffering; disability; disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

445.    Accordingly, LeeSar is vicariously liable to Individual Plaintiff for the full extent of these damages.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **LEESAR, INC.**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

**COUNT XXXIV**
**(Individual Plaintiff Claim Against ACS for Negligent Hiring)**

446.     Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as 150 through 162 and incorporates them herein as if fully set forth.

447.     At all times material hereto, ACS employed a Director or Vice-President of Sterilization Technologies (Fleischhacker) who was the senior corporate manager responsible for the ultimate operational oversight of all EtO sterilization processes at the EtO Facility and possibly others operated by ACS. ACS also employed local managers, supervisors, and staff (including Manager Cook and Manager Walls) responsible for the day-to-day operation, management, and supervision of the EtO Facility.

448.     The sterilization director position was the key senior role responsible for designing sterilization protocols, ensuring emission safety, and overseeing all regulatory filings (although, upon information and belief, that position would be tasked with boots on the ground operations at the Eto Facility) while the local managers, supervisors and staff were responsible for executing those protocols and the safe handling of EtO.

449.     ACS owed a heightened duty to exercise reasonable care in the selection, hiring, training, and retention of all individuals placed in these critical roles, as their positions involved the direct oversight and handling of a highly noxious, toxic, volatile, and carcinogenic gas.

450.     ACS further owed a duty to refrain from hiring or retaining individuals in these positions of responsibility who were unfit, unqualified, or incompetent to safely perform their assigned duties and who posed a foreseeable risk of harm to surrounding residents.

111

451.    Upon information and belief, a reasonable and appropriate investigation by ACS into the background and qualifications of its prospective director, managers, supervisors, and employees would have revealed their unsuitability for such sensitive and hazardous work, including but not limited to: (a) lack of knowledge of EtO medical sterilization process regulations including state and federal environmental regulations; (b) lack of proper training in hazardous chemical handling and emission-control procedures; (c) a prior history of disregarding or ignoring safety standards; (d) lack of experience or qualifications in managing emissions of toxic substances; and (e) propensities toward prioritizing cost-cutting and profits over health and safety.

452.    Despite the clear risks involved, ACS failed to conduct such reasonable investigations and negligently hired, trained, and retained unqualified and unfit individuals to these critical roles.

453.    These unqualified and unfit managers and supervisors, upon information and belief, subsequently engaged in unsafe practices, including: (a) instructing employees to disregard safety protocols and inventory control (tank tracking) in order to maximize throughput and profits; (b) after the installation of scrubbers in 2023, disregarding emission-control protocols and failing to maintain or repair equipment necessary to prevent fugitive emissions; (c) failing to properly train employees to monitor emission concentrations; (d) permitting the improper handling and storage of EtO, resulting in uncontrolled releases of the toxic gas; (e) failing to warn surrounding residents of the toxic and carcinogenic nature of EtO emissions; (f) failing to properly categorize the chambers as a "single-chambers combined sterilization/aeration process" for purposes of avoiding emission control requirements as early as 2014 or before; and (g) failing to report the use of a "single-chambers combined sterilization/aeration process" to regulators, which impacted the allowable legal limit of EtO that could be used under its permit.

112

454.    By failing to conduct reasonable investigations and by hiring and retaining individuals unfit to safely perform their duties, ACS made negligent decisions that created a foreseeable and unreasonable risk of harm to Individual Plaintiff and the surrounding community.

455.    As a proximate and substantial result of ACS's negligent hiring, training, and retention, its unqualified and unfit employees engaged in the unsafe and reckless practices alleged above, causing hazardous levels of EtO to be released into the surrounding community and chronically exposing Individual Plaintiff to hazardous levels of carcinogenic EtO emissions in the Exposure Zone.

456.    This exposure proximately and substantially caused Individual Plaintiff's serious and permanent health injuries, including Individual Plaintiff's diagnosed cancer. As a proximate and substantial result, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain;   suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

113

WHEREFORE, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT XXXV
**(Individual Plaintiff Claim Against Philip Fleischhacker for Negligence and Gross Negligence)**

457.     Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

458.     At all times material, Fleischhacker was the senior corporate manager responsible for the EtO Facility. Since at least 2009, he served as the Director of Sterilization Technologies and/or VP of Sterilization Technologies for ACS and, upon information and belief, after 2021, for OMI.

459.     In this role, Fleischhacker was and is the primary technical expert responsible for sterilization operations, emission systems, and regulatory compliance for the EtO Facility. He personally directed, managed, participated in, and oversaw the sterilization operations; personally submitted regulatory filings to the FDEP; and was the primary signatory on the documents that governed the EtO Facility's emissions.

460.     As the senior technical expert and regulatory manager personally directing an operation that handled and emitted massive quantities of a known human carcinogen directly adjacent to a dense residential community, Fleischhacker owed a personal, heightened duty of care to the Individual Plaintiff, as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated in a manner that would avoid unreasonable risk of harm. Fleischhacker breached his personal and heightened duty of care and acted with negligence and gross negligence. This negligence specifically includes, but is not limited to, the following

114

personal acts and omissions: (a) grossly failing to ensure the facility complied with the federal 1-ton NESHAP mandate (40 CFR §63.362(c)) (i.e., installing emission controls due to excess EtO usage) despite his personal, written admission to the FDEP on June 27, 2014, that he knew the facility was "going over the one ton limit";  (b) negligently or intentionally misrepresenting the EtO Facility's compliance status to state regulators by claiming in that same 2014 letter that the facility was only subject to the 10-ton "aeration chamber" rule, a claim he knew, or as the senior technical expert should have known, was false; (c) furthering this misrepresentation by deceptively claiming ACS used "1/10th the gas" of traditional sterilizers, while negligently or intentionally omitting the material fact that traditional sterilizers were legally required to capture 99.0% to 99.9% of their emissions (depending on annual tonnage usage) while the EtO Facility captured 0%, such that ACS emitted ten-times to one-hundred-times the amount of EtO than such traditional sterilizing operations; (d) repeating this fraudulent representation to regulators again in 2019; (e) failing, as the key technical manager, to properly categorize the EtO Facility's vents as a chamber utilized for single chamber combined sterilization/aeration process subject to the 1-ton rule, despite knowing the process and the law, and despite the company later admitting this was the correct categorization in its 2023 filings; (f) failing to utilize his operational oversight to install commercially available and customary abatement technology (scrubbers, etc.) that he knew would have mitigated the harm; and (g) personally overseeing a facility with a negligently designed "short stack" that he knew or should have known was causing ground-level fumigation of carcinogens in the adjacent neighborhood.

461.    These personal negligent acts and omissions by Fleischhacker, were committed within the course and scope of their employment with ACS, as well as his subsequent employment with OMI, and in furtherance of the business interest of ACS and OMI. Specifically,

Fleischhacker's tortious conduct occurred within the scope of his employment because his actions meet all three prongs of the established legal test. The conduct was of the kind he was hired to perform, as his role as Director of Sterilization Technologies explicitly included managing regulatory compliance and making decisions about emission systems; therefore, his communications with the FDEP and his decisions regarding control technology were a direct, albeit improper, part of his assigned duties. Furthermore, these acts occurred substantially within the authorized time and space limits of his job, as they were carried out during normal work hours from his corporate office using company resources. Most importantly, his actions were activated at least in part by a purpose to serve the employer, as the clear motive for evading the installation of mandated controls was to save ACS, and later OMI, from incurring significant capital expenditures and operational costs, a decision that directly served their financial interests by maximizing profits.

462.    These personal negligent acts and omissions by Fleischhacker, which constitute a profound breach of his professional duty of care, were the proximate and substantial cause of the EtO Facility's decade-long regulatory violation and the resulting uncontrolled release of carcinogenic EtO into the community. This resulting chronic exposure to EtO proximately and substantially caused Individual Plaintiff's diagnosed cancer.

463.    As a proximate and substantial result of Fleischhacker's negligence, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain; suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including

116

without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **PHILIP FLEISCHHACKER**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XXXVI
**(Individual Plaintiff Claim Against Manager Cook for Negligence)**

464.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

465.    From approximately 2009, even before the Eto Facility was operational, until in or about 2018, Manager Cook was the on-site supervisor and/or plant manager of the EtO Facility, routinely exercising direct, day-to-day operational control over the sterilization processes, equipment, and emissions, when Fleischhacker was not on the premises.

466.    In this role, Manager Cook personally participated in the tortious conduct alleged above. He was the named "Facility Contact" on the 2009 initial AGP permit submission (which also listed "None required" for emission controls) and, critically, was the "Facility Contact" (alongside Fleischhacker) on both the June 27, 2014 Letter to the FDEP (that admitted crossing

117

the 1-ton limit but argued the 10-ton rule applied) and the 2019 AGP Re-Registration (that repeated this fraudulent representation).

467.    As the individual with direct, on-site operational control of a facility emitting a known carcinogen, Manager Cook owed a personal, heightened duty of care to the Individual Plaintiff, as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated in a manner that would avoid unreasonable risk of harm.

468.    Manager Cook breached this personal duty of care and acted with negligence and gross negligence. This negligence includes, but is not limited to: (a) personally overseeing the daily, unabated venting of hazardous and carcinogenic EtO for nearly a decade; (b) personally participating in the submission of fraudulent regulatory filings in 2014 and 2019 that he knew, or as the plant manager should have known, falsely characterized the EtO Facility's vents to evade the mandatory 1-ton NESHAP control requirement; (c) failing to take any reasonable step to install commercially available emission controls and abatement technology (i.e., scrubbers), despite knowing the EtO Facility was violating the 1-ton trigger since at least 2014; (d) upon information and belief, systematically disregarding and failing to implement proper inventory controls (i.e., allowed lax record keeping) in order to maximize facility throughput at the expense of safety and regulatory compliance; (e) upon information and belief, failing to properly train and supervise on-site staff in the safe handling of hazardous chemicals, and permitting the improper handling and storage of EtO, resulting in uncontrolled releases; and (f) failing to warn the surrounding community of the dangers he was actively overseeing.

469.    These personal negligent acts and omissions by Manager Cook were committed within the course and scope of his employment with ACS. Specifically, the conduct was of the kind he was hired to perform; as the on-site Plant Manager exercising "direct, day-to-day

118

operational control," his responsibilities inherently included overseeing facility emissions, ensuring regulatory compliance, and managing staff. Therefore, his management of these specific duties, however negligent, was the work he was hired to perform. Furthermore, these negligent acts occurred substantially within the authorized time and space limits of his job, taking place at the EtO facility throughout his tenure. Critically, his actions were activated at least in part by a purpose to serve the employer, as his entire pattern of conduct, from overseeing unabated venting and failing to train staff to participating in misleading regulatory filings, was systematically undertaken to maximize facility throughput and avoid costly safety measures, directly serving the financial interests of his employer, ACS.

470.     These personal negligent acts and omissions by Manager Cook were a proximate and substantial cause of the EtO Facility's decade-long uncontrolled release of carcinogens. This resulting chronic exposure to EtO proximately and substantially caused Individual Plaintiff's cancer.

471.     As a proximate and substantial result of Manager Cook's negligence, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain; suffering; disability;  disfigurement;  mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money;  hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or

eFiled Lee County Clerk of Courts Page 119

continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **ROBERT COOK**, for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT XXXVII
### (Individual Plaintiff Claim Against Manager Walls for Negligence)

472.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

473.    From approximately 2019 to the present, Manager Walls has served as the on-site plant manager and/or general manager of the EtO Facility, exercising direct, day-to-day operational control over the sterilization processes, equipment, and emissions. In this role, Manager Walls personally participated in the tortious conduct alleged above, including serving as the "Facility Contact" and "Authorized Representative" for ACS and/or OMI during the critical period when the EtO Facility's continuing, unlawful, decades-long thwarting of federal regulations came to an end.

474.    As the individual with direct, on-site operational control of the facility, Manager Walls owed a personal, heightened duty of care to the Individual Plaintiff, as a member of the public within the foreseeable "zone of risk," to ensure the EtO facility operated in a manner that would avoid unreasonable risk of harm. Manager Walls breached this personal duty of care and acted with negligence and gross negligence. This negligence includes, but is not limited to: (a) personally overseeing the continued, unabated venting of hazardous EtO (from 2019 until July

120

2023), thereby continuing the regulatory violation established by her predecessors; (b) upon information and belief, failing to enforce protocols to minimize fugitive emissions, particularly after the 2023 scrubbers were installed; (c) upon information and belief, continuing the lax enforcement of EtO record-keeping to maximize throughput; (d) upon information and belief, failing to properly train and supervise staff in hazardous chemical handling and permitting the improper handling and storage of EtO; and (e) failing to warn the surrounding community of the dangers she was actively overseeing. These personal negligent acts and omissions by Manager Walls were a proximate and substantial cause of the EtO Facility's continued uncontrolled (pre-July 2023) release of carcinogens, which proximately and substantially caused and/or contributed to Individual Plaintiff's diagnosed cancer.

475.    These personal negligent acts and omissions by Manager Walls, were committed within the course and scope of their employment with ACS, as well as her subsequent employment with OMI, and in furtherance of the business interest of ACS and OMI. Specifically, Manager Walls' negligent conduct occurred within the scope of her employment because her actions meet all three prongs of the established legal test. The conduct was of the kind she was hired to perform; as the on-site plant manager exercising "direct, day-to-day operational control," her core responsibilities included overseeing facility emissions, managing staff, and making decisions regarding abatement technology. Therefore, her management of these specific duties, however negligent, was precisely the work for which she was hired. Furthermore, these negligent acts occurred substantially within the authorized time and space limits of her job, as they took place at the EtO facility during her tenure. Critically, her actions were activated at least in part by a purpose to serve the employer, as her entire pattern of conduct, from continuing the unabated venting through and knowingly failing to install necessary emission controls until mid-2023 to

121

disregarding protocols for fugitive emissions and record-keeping, was designed to maximize throughput and avoid capital expenditures, decisions that directly served the financial interests of her employers, ACS and OMI.

476.    These personal negligent acts and omissions by Manager Walls were a proximate and substantial cause of the EtO Facility's continued uncontrolled (pre-July 2023) release of carcinogens. This resulting chronic exposure to EtO proximately and substantially caused Individual Plaintiff's cancer.

477.    As a proximate and substantial result of Manager Walls's negligence, Individual Plaintiff sustained damages including: bodily injury, including the cancer; resulting pain; suffering; disability; disfigurement; mental anguish, including the fear of remission of such cancer; loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **PENNY WALLS,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

122

### COUNT XXXVIII
### (Individual Plaintiff Claim Against ACS for Vicarious Liability
### for Pre-Acquisition Negligence of Fleischhacker)

478.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs

150 through 162 and incorporates them herein as if fully set forth.

479.    At all times prior to December 21, 2021, an employer-employee relationship

existed between ACS and Fleischhacker, whereby ACS was his sole lawful employer and he

exercised ultimate operational oversight of the EtO Facility as more particularly alleged in

paragraph 458 and 459 which are incorporated herein by reference.

480.    During this period, Fleischhacker committed tortious conduct. As more

particularly alleged in paragraph 460, which is incorporated herein by reference. Such conduct

sounding in negligence included, but was not limited to, knowingly failing to comply with the

federal 1-ton NESHAP mandate for emission controls after admitting the facility exceeded the

usage limit; actively misrepresenting the facility's compliance status to regulators to evade these

requirements; and overseeing a negligently designed "short stack" that caused ground-level

fumigation of carcinogens in the adjacent community.

481.    All such conduct was committed within the course and scope of Fleischhacker's

employment with ACS and in furtherance of the business interest of ACS as more particularly

alleged in paragraph 461, which is incorporated herein by reference.

482.    Fleischhacker's tortious conduct proximately and substantially caused Individual

Plaintiff's damages, as more particularly alleged in paragraphs 462, 463, 563, and 564 which are

incorporated herein by reference.

483.    Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously

liable for the damages caused by the negligence of its employee, Fleischhacker.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages arising from the pre-acquisition negligence of its employee, Defendant, Philip Fleischhacker, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT XXXIX
### (Individual Plaintiff Claim Against OMI and ACS for Vicarious Liability for Post-Acquisition Negligence of Fleischhacker)

484.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

485.    On and after December 21, 2021, a joint employer-employee relationship existed between OMI, ACS, and Fleischhacker as, upon information and belief, OMI provided his remuneration and held the ultimate authority to hire, fire, and discipline him, while ACS directed his day-to-day duties and managed his work related to the EtO Facility.

486.    During this period, Fleischhacker continued to exercise ultimate operational oversight of the EtO Facility as more particularly alleged in paragraphs 458 and 459 which are incorporated herein by reference.

487.    During this period, Fleischhacker continued to commit tortious conduct as more particularly alleged in paragraph 460, which is incorporated herein by reference. This ongoing negligence included, but was not limited to, his failure to remedy the long-standing regulatory violations he established and his continued oversight of a facility with a negligently designed emission system that he knew or should have known was causing harm to the community.

488.    All such conduct was committed within the course and scope of Fleischhacker's joint employment with ACS and OMI, and in furtherance of the business interest of ACS and OMI, as more particularly alleged in paragraph 461, which is incorporated herein by reference.

124

489.    Fleischhacker's tortious conduct proximately and substantially caused Individual Plaintiff's damages, as more particularly alleged in paragraphs 462, 463, 563, and 564 which are incorporated herein by reference.

490.    Accordingly, as a direct and proximate result of the foregoing, OMI and ACS are jointly and severally liable for the damages caused by the negligence of their employee, Fleischhacker.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment holding Defendant, **OWENS & MINOR, INC.**, and Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, jointly and severally liable for compensatory damages arising from the post-acquisition negligence of their employee, Defendant, Philip Fleischhacker, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT XL
### (Individual Plaintiff Claim Against ACS for Vicarious Liability
### for Negligence of Manager Cook)

491.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

492.    During his employment from approximately 2010 through 2019, an employer-employee relationship existed between ACS and Manager Cook, whereby ACS was his sole lawful employer and he exercised direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 465 which is incorporated herein by reference.

493.    During this period, Manager Cook committed tortious conduct. As more particularly alleged in paragraph 466 through 468, which are incorporated herein by reference. Such conduct sounding in negligence included, but was not limited to, personally overseeing the

125

daily, unabated venting of hazardous and carcinogenic EtO for nearly a decade; participating in the submission of fraudulent regulatory filings to evade mandatory emission controls; and failing to warn the surrounding community of the dangers he was actively overseeing.

494.    All such conduct was committed within the course and scope of Manager Cook's employment with ACS and in furtherance of the business interest of ACS, as more particularly alleged in paragraph 469, which is incorporated herein by reference..

495.    Manager Cook's tortious conduct proximately and substantially caused Individual Plaintiff's damages, as more particularly alleged in paragraphs 470, 471, 563, and 564 which are incorporated herein by reference.

496.    Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously liable for the damages caused by the negligence of its employee, Manager Cook.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages arising from the negligence of its employee, Defendant, Robert Cook, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XLI
### (Individual Plaintiff Claim Against ACS for Vicarious Liability for Pre-Acquisition Negligence of Manager Walls)

497.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

498.    From approximately 2019 until December 21, 2021, an employer-employee relationship existed between ACS and Manager Walls, whereby ACS was her sole lawful

126

employer and she exercised direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 473 which is incorporated herein by reference.

499.    During this period, Manager Walls committed tortious conduct. As more particularly alleged in paragraph 474, which is incorporated herein by reference. Such conduct sounding in negligence included, but was not limited to, personally overseeing the continued, unabated venting of hazardous EtO, thereby continuing the regulatory violation established by her predecessors; continuing the lax enforcement of EtO record-keeping to maximize throughput; and failing to warn the surrounding community of the dangers she was actively overseeing.

500.    All such conduct was committed within the course and scope of Manager Walls's employment with ACS and in furtherance of the business interest of ACS as more particularly alleged in paragraph 475, which is incorporated herein by reference.

501.    Manager Walls's tortious conduct proximately and substantially caused Individual Plaintiff's damages, as more particularly alleged in paragraphs 476, 477, 563, and 564 which are incorporated herein by reference.

502.    Accordingly, as a direct and proximate result of the foregoing, ACS is vicariously liable for the damages caused by the negligence of its employee, Manager Walls.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC**., for compensatory damages arising from the pre-acquisition negligence of its employee, Defendant, Penny Walls, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT XLII
### (Individual Plaintiff Claim Against OMI and ACS for Vicarious Liability for Post-Acquisition Negligence of Manager Walls)

503.    Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

504.    On and after December 21, 2021, a joint employer-employee relationship existed between OMI, ACS, and Manager Walls as, upon information and belief, OMI provided her remuneration and held the ultimate authority to hire, fire, and discipline her, while ACS directed her day-to-day duties and managed her work related to the EtO Facility.

505.    During this period, Manager Walls continued to exercise direct, day-to-day operational control of the EtO Facility as more particularly alleged in paragraph 473 which is incorporated herein by reference.

506.    During this period, Manager Walls continued to commit tortious conduct as more particularly alleged in paragraph 474 which is incorporated herein by reference. This ongoing negligence included, but was not limited to, personally overseeing the continued, unabated venting of hazardous EtO from the facility until July 2023, and failing to enforce protocols to minimize fugitive emissions, particularly after the 2023 scrubbers were installed.

507.    All such conduct was committed within the course and scope of Manager Walls's joint employment with ACS and OMI, and in furtherance of the business interest of ACS and OMI, as more particularly alleged in paragraph 475 which is incorporated herein by reference.

508.    Manager Walls's tortious conduct proximately and substantially caused Individual Plaintiff's damages, as more particularly alleged in paragraphs 476, 477, 563, and 564 which are incorporated herein by reference.

128

509.     Accordingly, as a direct and proximate result of the foregoing, OMI and ACS are jointly and severally liable for the damages caused by the negligence of their employee, Manager Walls.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment holding Defendant, **OWENS & MINOR, INC**., and Defendant, **AMERICAN CONTRACT SYSTEMS, INC.**, jointly and severally liable for compensatory damages arising from the post-acquisition negligence of their employee, Defendant, Penny Walls, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT XLIII
**(Individual Plaintiff Claim Against Croci for Negligence)**

510.     Individual Plaintiff hereby realleges paragraphs 1 through 69 as well as paragraphs 150 through 162 and incorporates them herein as if fully set forth.

511.     From 2010 to 2015 Croci owned the real property located at 11600 Adelmo Lane, Fort Myers, Florida 33966 (the "Building").

512.     The Building was divided into two suites, with, upon information and belief,  Croci leasing possession of Suite 1 to a related business entity and also using it as its main office address.

513.     Upon information and belief, from at least 2010 through 2015, Croci leased, permitted, or otherwise allowed ACS to operate its EtO Facility from Suite 2 of the Building.

514.     Croci owed a duty to Individual Plaintiff and to the public residing in the vicinity of the Building to exercise reasonable care in the ownership, leasing, and control of the Building, and to refrain from allowing its Building to be used in a manner that foreseeably created unreasonable risks of harm to others off the property.  This duty was owed both prior to and after entry into the lease with ACS.

515.    Croci, both before and after the execution of the lease, knew or should have known
of the intention to install and actual installation of single chambers, vents, exhaust vents, exhaust
fans, and 31-foot stacks in Suite 2.  Likewise, Croci knew or should have known that no emission
control devices were to be or were, in fact, connected to the emission system exhausting EtO
directly into the air.

516.    After entry into the lease, as a landlord on site, Croci would have had occasion to
enter Suite 2. Since at least 1984, OSHA required employers to post conspicuous warning signs
wherever employees might be exposed to EtO. The Ethylene Oxide Standard, 29 C.F.R. §
1910.1047 (adopted June 22, 1984, 49 Fed. Reg. 25734), expressly mandates that such signs bear
the word "DANGER" and state: "ETHYLENE OXIDE, CANCER HAZARD AND
REPRODUCTIVE HAZARD. AUTHORIZED PERSONNEL ONLY." In addition, OSHA's
general signage rule, 29 C.F.R. § 1910.145 (amended Feb. 10, 1984, 49 Fed. Reg. 5322), required
that danger signs be legible and readable from at least five feet away.

517.    Thus, after entry into the lease, given these longstanding federal requirements,
Croci, as ACS's landlord, knew or should have known of the significant dangers posed by EtO
and its carcinogenic and reproductive hazards.

518.    Based on the foregoing, Croci knew or should have known this carcinogenic
chemical, namely EtO, was being spewed into the surrounding neighborhood.

519.    Croci knew or should have known that allowing the Building to be used 24-hours
a day, 365-days a year, as a large-scale[4] emitter of EtO into the atmosphere, a known hazardous

---

[4] While ACS would tout their gas-in-bag sterilization process as utilizing only 10% of the EtO of traditional
sterilization facilities, due to ACS avoidance of regulatory mandates to install emission controls, the EtO Facility in
fact, emitted 10 times the amount of EtO into the atmosphere than such traditional facility.  It was, in fact, a large-
scale emitter of EtO.

130

and carcinogenic chemical, without no effective emissions controls, created a foreseeable risk of harm to people in the surrounding community.

520.    Croci had a duty of reasonable care not to expose the people in the nearby communities to the zone of danger created by the EtO emissions.  Such duty was also informed by the high degree of harm presented by the release of such noxious gas into such a populated area.

521.    Croci also owed a duty to Individual Plaintiff because they retained significant control over portions of the EtO Facility, including the roof, exterior, and other structural elements, and knew or should have known of the dangerous conditions existing at the EtO Facility when the leases were executed.

522.    Croci breached its duty of care by, among other things: (a) leasing or permitting its Building to be used for inherently and/or abnormally dangerous EtO sterilization without requiring adequate emission controls; (b) failing to investigate or ensure that ACS's operations complied with reasonable health and safety practices; (c) failing to warn residents in the community, including Individual Plaintiff, of the dangerous emissions originating from the Building; and (d) continuing to allow the hazardous operations to occur despite actual and/or constructive knowledge of the risks.

523.    As a direct and proximate result of Croci's negligence, harmful emissions routinely migrated from the Building, both stacks emissions and fugitive emissions (from the entry and exit points of the Building's habitable envelope), into the surrounding community, contaminating the air in and around Individual Plaintiff's Property, school, and/or place of work.  This resulted in the Individual Plaintiff's long-term, involuntary inhalation of EtO into Individual Plaintiff's lungs, resulting in it entering the blood stream and being carried throughout Individual Plaintiff's body. The chronic cellular exposure to EtO resulted in damage to the Individual Plaintiff's DNA. In turn,

131

as more particularly explained above, this damaged DNA replicated within Individual Plaintiff's body and was ultimately a substantial cause of Individual Plaintiff's cancer.

524.    As a result of such cancer, Individual Plaintiff suffered bodily injury; resulting pain; suffering; disability; disfigurement; mental anguish, including the fear of remission of such cancer; loss of capacity for the enjoyment of life; loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

**WHEREFORE**, Individual Plaintiff demands judgment against Defendant, **CROCI REAL ESTATE, LLC**, for compensatory damages, together with interest, costs, attorney's fees as allowed by law, and such other relief as this Court deems just and proper.

## PART 4
## CORPORATE PARENTAL LIABILITY

*Allegations Common to Corporate Parental Liability Claims Set Forth in Section A, Part 4 Are
Incorporated Within These Counts and Accordingly Are Not Repeated Here*

132

## COUNT XLIV
### (Individual Plaintiff Claim Against OMI for Vicarious Liability Based on Agency)

525.     Individual Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297, and incorporates them herein as if fully set forth.

526.     An agency relationship under Florida law is established where the principal acknowledges the agent will act for it, the agent accepts the undertaking, and the principal retains control.

527.     In this matter, the elements of an actual agency relationship are established by the common allegation as to OMI and O&M Halyard, which demonstrate that ACS "manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation."

528.     These facts include, among others: (a) Acknowledgment by the Principal (OMI): OMI acknowledged that ACS was acting on its behalf and as its integrated component by: (i) holding ACS out to federal regulators as "Owens & Minor, Inc. dba American Contract Systems, Inc." (¶ 287); (ii) publicly representing its relationship with ACS to customers and the market as a direct and seamless integration into OMI, deliberately omitting the separate intermediary structure (¶ 276); (iii) representing the combined operation to investors as a single fully integrated and vertically-integrated enterprise, using consolidated terms like "we," "our," and "Company" to describe the subsidiary's operations ((¶ 272), (¶ 278), (¶ 292)); (iv) issuing "URGENT: MEDICAL DEVICE FIELD CORRECTION" notices directly as "Owens & Minor" and serving as the public point of contact, thereby acknowledging its role as the principal responsible for the agent's products (¶ 289);  (v) acknowledging the financial risks of the EtO sterilization operations as a direct risk to OMI itself in SEC filings to its own investors (¶ 279); and (vi) projecting its corporate identity into the EtO Facility by supplying a poster celebrating OMI's 140th anniversary and

133

requiring it to be displayed on the facility's wall (¶ 285). (b) Acceptance by the Agent (ACS): ACS accepted its role as OMI's agent by: (i) complying with OMI's enterprise-wide branding, direction, and operational directives, including product recalls (¶ 289); (ii) accepting the integration of its own ACS executive, Charlie Persby, into the OMI corporate structure, whereby Mr. Persby publicly identifies his primary role as "VP, Corporate Accounts" for Owens & Minor (¶ 283); and (iii) functioning in a dependent manner upon OMI's provision of essential day-to-day adjuncts and shared services, including HR, regulatory direction, IT, and legal support (¶ 288). (c) Control by the Principal (OMI): OMI exercised "high and very significant" and granular control over the daily operations giving rise to this lawsuit, including: (i) staffing the EtO Facility with its own employees in key management and compliance roles, including the Plant Manager and the Director of Sterilization, who identify as OMI employees (¶ 281); (ii) directing all essential central services necessary for daily operations, including human resource management, regulatory direction, information technology, emission control technology, and legal support (¶ 288); (iii) exercising direct command over regulatory compliance by having OMI directors communicate with the FDA regarding the EtO Facility (¶ 280), (¶ 287)); (iv) treating the ACS General Manager as a divisional manager (an OMI VP) integrated directly into OMI's management structure (¶ 283); and (v) exercising ultimate operational control over product safety by initiating and managing enterprise-wide recalls (¶ 289).

529.    Accordingly, from December 16, 2021, ACS acted as OMI's actual agent in conducting its EtO sterilization operations at issue in this Complaint.    Because ACS was acting as OMI's agent and within the course and scope of that agency during this period, OMI, as the principal, is vicariously liable for the tortious conduct of its agent, ACS, as alleged in this Complaint occurring from that date forward.

134

**WHEREFORE**, Individual Plaintiff respectfully requests this Court enter judgment against Defendant, **OWENS & MINOR, INC.**, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT XLV
**(Individual Plaintiff Claim Against OMI and O&M Halyard for Parental Liability Based on Alter Ego and Piercing the Corporate Veil)**

530.    Individual Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297 and incorporates them herein as if fully set forth.

531.    Under Florida law, the corporate veil may be pierced where a parent so dominates and controls a subsidiary that the subsidiary is a "mere instrumentality," <u>and</u> the corporate form is used to mislead creditors, perpetrate a fraud, or work an injustice. <u>See</u> <u>Dania Jai-Alai Palace, Inc. v. Sykes</u>, 450 So. 2d 1114 (Fla. 1984). This standard applies when an ultimate parent uses its dominant control over one subsidiary (an intermediary) to facilitate a fraudulent scheme or insulate the parent from the known liabilities of another operating subsidiary, thereby using the entire structure as a "corporate fiction" or "sham to accomplish some ulterior purpose." <u>See</u> <u>Steinhardt v. Banks</u>, 511 So. 2d 336 (Fla. 4th DCA 1987).

532.    OMI and O&M Halyard satisfy both prongs of the <u>Dania Jai-Alai</u> test, demonstrating both complete domination of ACS as a "mere instrumentality" and the use of that corporate structure to perpetrate a fraud and a manifest injustice.

533.    Domination (Alter Ego): OMI and O&M Halyard, and ACS, functioned as a single instrumentality dominated by OMI. OMI dominates O&M Halyard, and the proof of this domination is that O&M Halyard manifested no separate corporate interests of its own regarding its own subsidiary, ACS. Instead, O&M Halyard, acting in the role of a stooge, allowed OMI (the

135

grandparent) to cause it to acquire ACS in the first instance and allowed OMI to completely bypass it and exercise direct, operational control over ACS (the grandchild). This direct OMI-to-ACS control is, upon information and belief, established by: (a) OMI staffing ACS facilities with employees identifying as OMI employees (¶ 281); (b) OMI providing core business services including human resources, information technology, legal services, and emissions technology (¶ 288); (c) Charlie Persby identifying as an OMI VP (not an O&M Halyard VP) (¶ 283); (d) OMI handling key FDA regulatory compliance for ACS directly as OMI d/b/a ACS (¶ 280), (¶ 287)); (e) OMI exercising direct command over product safety and market activity by initiating and managing enterprise-wide product recalls as "Owens & Minor" and serving as the direct customer point of contact (¶ 289); (f) OMI consistently disregarding all corporate separateness in its public-facing identity, representing the entire operation to investors, customers, and employees as a single, "fully integrated" enterprise ((¶ 272), (¶ 278)), using consolidated SEC language like "we" and "our" (¶ 292), claiming Florida distribution centers as its own (¶ 291), and completely omitting O&M Halyard from its public narrative of the acquisition (¶ 276); (g) OMI further disregarded corporate separateness by distributing and requiring display of corporate anniversary materials, including a poster celebrating OMI's 140th anniversary, at the EtO Facility. Such directives demonstrate OMI's treatment of the facility as its own operation (¶ 285).

534.    Improper Conduct (Fraud and Injustice): OMI used its total domination over its subsidiaries, including O&M Halyard, to perpetrate a fraud and cause manifest injustice. This improper conduct, upon information and belief, includes: (a) Fraudulent Use of O&M Halyard as a Stooge/Intermediary: The central improper conduct is the fraudulent structuring of the ACS acquisition. Knowing ACS possessed massive foreseeable tort liabilities (¶ 279), OMI used its dominant control over its otherwise legitimate subsidiary, O&M Halyard, to force it to act as a

136

"convenient stooge." O&M Halyard was used not for a legitimate business synergy, but as a "pretext" and "legal structure designed to create a layer of corporate distance" (¶ 275), a shield to absorb the ACS liability and insulate the ultimate parent, OMI. (b) the Bifurcated Strategy Fraud: OMI and O&M Halyard participated in a fraudulent bifurcated strategy (¶ 286). OMI publicly claimed ACS as its own direct, vertically-integrated division to customers and investors ((¶ 272), (¶ 276), (¶ 278), (¶ 287)), while simultaneously relying on O&M Halyard's corporate form (the stooge) to legally distance itself from ACS's known environmental torts. (c) Strategic Undercapitalization and Fund Depletion: OMI used its control over the entire structure to utilize ACS as a pledge to collateralize its own corporate obligations and ambitions, while upon information and belief, depleting ACS's cash assets and sweeping its revenues into OMI controlled financial vehicles (¶ 293), leaving ACS inadequately capitalized to satisfy known liabilities OMI has worked to avoid incurring itself. This use of a parent-controlled structure to deplete funds and strand creditors is a paradigmatic improper purpose. (d) Concealment and Consciousness of Guilt: OMI engaged in concealment by scrubbing its corporate website of admissions that ACS was "fully integrated," demonstrating guilty knowledge that its public claims (which bypassed O&M Halyard) were true and legally damaging (¶ 294). (e) Strategic Divestiture to Evade Known Liabilities: Upon information and belief, OMI is finalizing the scheme by divesting the entire segment including ACS and O&M Halyard (¶ 295). OMI's own $755.5 million write-down (¶ 296) is a financial admission of these massive liabilities. Using O&M Halyard as a tool to absorb and then dump these known liabilities constitutes a manifest injustice (¶ 297).

535.    This pattern of domination and improper conduct designed to strand known tort victims, satisfies the <u>Dania Jai-Alai</u> test. Equity should not permit this conduct. Accordingly, the corporate veils of both ACS and O&M Halyard should be pierced, with OMI and O&M Halyard

being held jointly and severally liable as the alter egos of ACS for the tortious conduct of ACS as alleged in this Complaint.

**WHEREFORE**, Individual Plaintiff respectfully requests that this Court enter judgment against OMI and O&M Halyard holding them jointly and severally liable with ACS for all compensatory damages, together with interest, costs, and such further relief as this Court deems just and proper.

## PART 5
## BATTERY CLAIMS

### Allegations Common to Battery Claims

*Allegations Common to Battery Claims Set Forth in Section A, Part 5 (Other Than For Damages) Are Incorporated Within These Counts and Accordingly Are Not Repeated Here*

536.    As a proximate and substantial result of this repeated and chronic physical touching (the "Battery"), EtO entered Individual Plaintiff's bloodstream, causing chronic cellular exposure and damage to Individual Plaintiff's DNA. This damaged DNA replicated within Individual Plaintiff's body and was a proximate and substantial cause of Individual Plaintiff's diagnosed cancer.

537.    As a proximate and substantial result of this Battery, as more particularly alleged above, Individual Plaintiff suffered damage to her DNA resulting in cancer. Consequently, Individual Plaintiff suffered bodily injury; resulting pain;  suffering; disability;  disfigurement; mental anguish, including the fear of remission of such cancer;  loss of capacity for the enjoyment of life;  loss of earnings; aggravation of preexisting conditions; loss of ability to earn money; hospitalization, medical care, pharmacological services (including without limitation oral and intravenous medication), oncological care (including without limitation chemotherapy and/or

138

radiation therapy or such oncological treatment and therapies), rehabilitative care, nursing care, treatment and expenses as well as travel expenses related to such care and treatment; various temporary and/or permanent modifications to their home, vehicle, and/or lifestyle. Some or all of these injuries and losses are permanent or continuing, and Individual Plaintiff will suffer some or all the losses in the future. All losses suffered are inclusive of past, present and future losses for the remainder of Individual Plaintiff's life.

## COUNT XLVI
### (Individual Plaintiff Claim Against ACS for Battery)

538.    Individual Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 309 through 312 and 536 through 537, and incorporates them herein as if fully set forth.

539.    ACS acted with the intent to engage in the conduct that resulted in the Battery. This intentional conduct included the intentional operation of sterilization chambers, the intentional venting of EtO, and the intentional design and operation of its facility (using an uncontrolled method and short stack) that caused the emissions.

540.    As more specifically alleged above (including in the General Allegations and Individual Plaintiff Claim Against ACS for Trespass count), ACS knew with substantial certainty that intentionally performing these acts in a densely populated area would cause EtO to physically contact (be inhaled by) and invade the bodies of individuals in the surrounding community, including Individual Plaintiff.

541.    ACS's intentional acts, performed with knowledge of substantial certainty that contact would occur, resulted in the unconsented, harmful, and offensive contact, which proximately and substantially caused Individual Plaintiff's cancer, as alleged in the Common Battery Allegations.

139

542.     ACS is therefore directly liable for the Battery and all resulting damages.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment against Defendant, **AMERICAN CONTRACT SYSTEMS, INC.,** for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### COUNT XLVII
### (Individual Plaintiff Claim Against LeeSar, OMI and O&M Halyard
### for Civil Conspiracy to Commit Battery)

543.     Individual Plaintiff hereby realleges paragraphs 1 through 69, as well as paragraphs 272 through 297, 309 through 312, and 536 through 537, and incorporates them herein as if fully set forth.

544.     This claim is derivative of the Individual Plaintiff Claim for Battery set forth in the immediate preceding count against ACS. ACS is liable on account of such claim for damages to Individual Plaintiff.

545.     LeeSar, OMI, O&M Halyard, and ACS were members to an agreement and conspiracy to commit such Battery.

546.     As to O&M Halyard, the conspiratorial agreement was predicated on its distinct personal stake, which was adverse to the unified interests of the OMI enterprise. The scheme was structured to function as a symbiotic, fraudulent firewall. O&M Halyard's corporate form served to insulate OMI from enterprise liability, a goal consistent with a unified corporate interest. Simultaneously, however, OMI's direct operational bypass of O&M Halyard to control ACS served to insulate O&M Halyard from direct operational culpability for the tortious conduct. O&M Halyard's personal stake arose from the latter. As an established entity with a distinct legal persona and valuable historical goodwill predating the acquisition, Halyard's acquiescence to this

140

fraudulent bypass was bargained for in exchange for a benefit unique to itself: the preservation of its own corporate identity from the direct reputational and legal contamination that would arise from managing ACS's operations. While OMI's motive was the protection of the conglomerate, O&M Halyard's motive was the protection of its own unique identity from the conglomerate's other actors. This self-preservationist motive, to avoid direct culpability by serving as a willing stooge in the bypass, is fundamentally separate from and adverse to its ordinary role as a subsidiary.

547.    This conspiracy transpired over two periods.

548.    The first period was the Initial Conspiracy dating from approximately 2010 to December 21, 2021. The conspirators ACS (acting through its key management, including Fleischhacker) and LeeSar (acting as the on-site operational partner directing throughput from its co-located space) formed the initial agreement.

549.    The second period was the Continuing Conspiracy dating from approximately December 21, 2021, to the present. During this period OMI, through its subsidiary O&M Halyard, acquired ACS and joined the ongoing conspiracy.

550.    This conspiracy was executed through a continuous agreement that grew over time which shared the unlawful objective of committing a battery against Individual Plaintiff and the community for financial gain.  Initially, during the first period, the co-conspirators were Defendants ACS and LeeSar. They formed an agreement to profit from the high-throughput sterilization of medical devices using an uncontrolled emissions method that they knew was substantially certain to result in harmful and offensive contact with residents, including Individual Plaintiff. Subsequently, during the second period, a new and broader agreement was formed among Defendants OMI, O&M Halyard, ACS, and LeeSar, which incorporated the objective of the first,

141

to continue the battery against the community for profit, but added a fraudulent purpose: to use the newly implemented parent-subsidiary structure to insulate the ultimate parent, OMI, from the massive and foreseeable tort liabilities generated by the operation. As part of this expanded agreement, OMI and O&M Halyard did not merely continue the prior operation; they actively conspired to create and maintain a fraudulent corporate shield, with O&M Halyard agreeing to serve as the stooge intermediary, thereby furthering the battery while attempting to ensure the primary beneficiary would evade responsibility.

551.    Overt acts were committed by all co-conspirators in furtherance of this continuous agreement.

552.    ACS: (Pre- and Post-Acquisition) Committed the daily overt act of intentionally venting hazardous EtO via the uncontrolled "gas-in-bag" method, utilizing a short stack resulting in ground-level fumigation, all under the continuous oversight of its Director of Sterilization.

553.    LeeSar: (Pre- and Post-Acquisition) Committed the overt acts of scheduling the throughput, directing sterilization orders from its co-located space, and actively aiding and abetting the continuous battery performed by both the original and successor operators (ACS and OMI).

554.    OMI: (Post-Acquisition) Joined and furthered the conspiracy by committing overt acts of direct command, including: (a) retaining ACS's key technical management (Fleischhacker) to continue the sterilization operations; (b) directing the facility's "regulatory direction" and "emission control technology"; and (c) identifying itself to the FDA as the actual operator ("dba American Contract Systems, Inc.") .

555.    O&M Halyard: (At Acquisition) Committed the overt act of agreeing to serve as the fraudulent passive stooge/intermediary designed solely to create a layer of corporate distance and insulate OMI, the conspiracy's primary beneficiary, from liability.

142

556.     All co-conspirators knew, given the extensive history of EtO's hazards, the uncontrolled method, and the EtO Facility's location, that their agreed-upon plan was substantially certain to result in a battery against the surrounding residents, which includes Individual Plaintiff.

557.     As a proximate and substantial result of these acts done in furtherance of the ongoing conspiracy, Individual Plaintiff was subjected to the Battery (chronic exposure), which proximately and substantially caused Individual Plaintiff's diagnosed cancer.

558.     As co-conspirators, LeeSar, OMI, and O&M Halyard are jointly and severally liable for all damages resulting from the Battery committed by ACS in furtherance of their agreement.

**WHEREFORE**, Individual Plaintiff respectfully requests judgment holding Defendants, **LEESAR, INC**., **OWENS & MINOR, INC**., and **O&M HALYARD, INC**., jointly and severally liable for the compensatory damages alleged in the Common Battery Allegations, together with interest, costs, attorneys' fees, and all relief as this Court deems just and proper.

## PART 6
## MEDICAL MONITORING

### COUNT XLVIII
### (Individual Plaintiff Claim Against ACS, Fleischhacker, Manager Cook and Manager Walls for Medical Monitoring)

559.     Individual Plaintiff hereby realleges paragraphs 1 through 69 and incorporates them herein as if fully set forth.

560.     As a direct and proximate result of the tortious conduct of the Defendants, Individual Plaintiff was exposed to EtO, a proven hazardous substance, at levels significantly greater than normal background levels.

143

561.    This exposure was caused by the negligence of ACS (Counts VII, VIII, and X), the personal negligence of Fleischhacker (Count XI), the personal negligence of Manager Cook (as alleged in Count XII), and the personal negligence of Manager Walls (Count XIII). The acts and omissions of each of these defendants, as alleged in this Complaint, were a proximate cause of Individual Plaintiff's exposure.

562.    As a proximate and substantial result of such exposure, Individual Plaintiff not only contracted cancer as more particularly alleged above, but Individual Plaintiff also now has a significantly increased risk of contracting a serious latent disease, including, but not limited to, the development of secondary malignancies and/or the recurrence of Individual Plaintiff's diagnosed cancer.

563.    A monitoring procedure exists that makes the early detection of such diseases possible, and the prescribed monitoring regime differs from that normally recommended for a member of the general public in the absence of such exposure.

564.    This prescribed monitoring is reasonably necessary according to contemporary scientific principles to mitigate the life-threatening consequences of the latent diseases for which Individual Plaintiff is now at risk due to the conduct of the Defendants. The costs associated with this necessary, lifetime medical monitoring program are a direct and foreseeable damage caused by each Defendant's tortious conduct.

**WHEREFORE**, Individual Plaintiff requests judgment against Defendants, **AMERICAN CONTRACT SYSTEMS, INC.**, **PHILIP FLEISCHHACKER**, **ROBERT COOK**, and **PENNY WALLS**, for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and such further relief as the Court deems proper, including, without limitation, allowable prejudgment and post-judgment interest.

144

## DEMAND FOR JURY TRIAL

Individual Plaintiff hereby demands trial by jury as to all issues.

**RESPECTFULLY SUBMITTED,**
**HERTZ LAW FIRM**

**/s/ Joshua J. Hertz**
_____

**Joshua J. Hertz**
Florida Bar Number 524085
5803 NW 151st St., Ste. 205
Miami Lakes, FL 33014-2478
Telephone (305) 374-0374
Facsimile (305) 929-8366
E-Service Primary: Jhertz@hertzlawfirm.com
E-Service Secondary: filing@hertzlawfirm.com

*Counsel for Plaintiffs, Nomeki Neskes, as Putative*
*Personal Representative of Emmanuel Neskes, and*
*Nomeki Neskes, Individually*

145